PARKER $v.$ RANDOLPH ET AL.

No. 78–99.  Argued March 20, 1979—Decided May 29, 1979

Rehnquist, J., announced the Court's judgment and delivered an opinion of the Court with respect to Parts I and III, in which Burger, C. J., and Stewart, White, and Blackmun, JJ., joined, and an opinion with respect to Part II, in which Burger, C. J., and Stewart and White, JJ., joined. Blackmun, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 77. Stevens, J., filed a dissenting opin-

ion, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. 81. POWELL, J., took no part in the consideration or decision of the case.

*Michael E. Terry,* Assistant Attorney General of Tennessee, argued the cause for petitioner. With him on the brief were *William M. Leech, Jr.,* Attorney General, and *Robert E. Kendrick,* Deputy Attorney General.

*Walter L. Evans,* by appointment of the Court, 439 U. S. 1064, argued the cause and filed a brief for respondents.

MR. JUSTICE REHNQUIST delivered the opinion of the Court (Parts I and III) together with an opinion (Part II), in which THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE WHITE joined, and announced the judgment of the Court.

In *Bruton* v. *United States,* 391 U. S. 123 (1968), this Court reversed the robbery conviction of a defendant who had been implicated in the crime by his codefendant's extrajudicial confession. Because the codefendant had not taken the stand at the joint trial and thus could not be cross-examined, the Court held that admission of the codefendant's confession had deprived the defendant of his rights under the Confrontation Clause of the Sixth Amendment. The issue before us in this case is whether *Bruton* requires reversal of a defendant's conviction when the defendant himself has confessed and his confession "interlocks" with and supports the confession of his codefendant. We hold that it does not.

I

Respondents were convicted of murder committed during the commission of a robbery and were sentenced to life imprisonment. The cast of characters playing out the scenes that led up to the fatal shooting could have come from the pen of Bret Harte.[1] The story began in June 1970, when

---

[1] As the Court of Appeals aptly commented: "This appeal involves a sequence of events which have the flavor of the old West before the law

one William Douglas, a professional gambler from Las Vegas, Nev., arrived in Memphis, Tenn., calling himself Ray Blaylock and carrying a gun and a deck of cards. It ended on the evening of July 6, 1970, when Douglas was shot and killed in a Memphis apartment.

Testimony at the trial in the Tennessee state court showed that one Woppy Gaddy, who was promised a cut of Douglas' take, arranged a game of chance between Douglas and Robert Wood, a sometime Memphis gambler. Unwilling to trust the outcome of the contest entirely to luck or skill, Douglas marked the cards, and by game's end Robert Wood and his money had been separated. A second encounter between the two men yielded similar results, and Wood grew suspicious of Douglas' good fortune. In order to determine whether and how Douglas was cheating, Wood brought to the third game an acquaintance named Tommy Thomas, who had a reputation of being a "pretty good poker player." Unknown to Wood, however, Thomas' father and Douglas had been close friends; Thomas, predictably, threw in his lot with Douglas, purposefully lost some $1,000, and reported to Wood that the game was clean. Wood nonetheless left the third game convinced that he was being cheated and intent on recouping his now considerable losses. He explained the situation to his brother, Joe E. Wood, and the two men decided to relieve Douglas of his ill-gotten gains by staging a robbery of the upcoming fourth game.

At this juncture respondents Randolph, Pickens, and Hamilton entered the picture. To carry out the staged robbery, Joe Wood enlisted respondent Hamilton, who was one of his employees, and the latter in turn associated respondents Randolph and Pickens. Douglas and Robert Wood sat down to the fourth and final contest on the evening of July 6, 1970. Joe Wood and Thomas were present in the room as spectators.

ever crossed the Pecos. The difference is that here there are no heroes and here there was a trial." 575 F. 2d 1178, 1179 (CA6 1978).

During the course of the game, Douglas armed himself with a .38-caliber pistol and an automatic shotgun; in response to this unexpected development Joe Wood pulled a derringer pistol on Douglas and Thomas, gave the gun to Robert Wood, and left to tell respondents to move in on the game. Before respondents arrived, however, Douglas reached for his pistol and was shot and killed by Robert Wood. Moments later, respondents and Joe Wood broke down the apartment door, Robert Wood gathered up the cash left on the table, and the gang of five fled into the night. Respondents were subsequently apprehended by the police and confessed to their involvement in the crime.

Respondents and the Wood brothers were jointly tried and convicted of murder during the commission of a robbery. Tenn. Code Ann. § 39–2402 (1975).[2] Each defendant was sentenced to life imprisonment. Robert Wood took the stand at trial, admitting that he had killed Douglas, but claiming that the shooting was in self-defense. Thomas described Douglas' method of cheating at cards and admitted his complicity in the fraud on Robert Wood. He also testified in substance that he was present in the room when Joe Wood produced the derringer and when Robert Wood shot and killed Douglas.

None of the respondents took the stand. Thomas could not positively identify any of them, and although Robert Wood named Hamilton as one of the three men involved in the staged robbery, he did not clearly identify Randolph and Pickens as the other two. The State's case against respondents thus rested primarily on their oral confessions, found by

---

[2] Tennessee Code Ann. § 39–2402 (1975) provides in pertinent part as follows:

"An individual commits murder in the first degree if . . .

"(4) he commits a willful, deliberate and malicious killing or murder during the perpetration of any arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing, or discharging of a destructive device or bomb."

the trial court to have been freely and voluntarily given, which were admitted into evidence through the testimony of several officers of the Memphis Police Department.[3]  A written confession signed by Pickens was also admitted into evidence over his objection that it had been obtained in violation of his rights under *Miranda* v. *Arizona,* 384 U. S. 436 (1966).  The trial court instructed the jury that each confession could be used only against the defendant who gave it and could not be considered as evidence of a codefendant's guilt.

The Tennessee Court of Criminal Appeals reversed respondents' convictions, holding that they could not be guilty of felony murder since Douglas had been shot before they arrived on the scene and, alternatively, that admission of their confessions at the joint trial violated this Court's decision in *Bruton.*  The Tennessee Supreme Court in turn reversed the Court of Criminal Appeals and reinstated the convictions. Because "each and every defendant either through words or actions demonstrated his knowledge that 'killing may be necessary,'" App. 237, the court held that respondents' agreement to participate in the robbery rendered them liable under the Tennessee felony-murder statute for Douglas' death.  The Tennessee Supreme Court also disagreed with the Court of Criminal Appeals that *Bruton* had been violated, emphasizing that the confession at issue in *Bruton* had inculpated a *nonconfessing* defendant in a joint trial at which neither defendant took the stand.  Here, in contrast, the "interlocking inculpatory confessions" of respondents Randolph, Pickens, and Hamilton, "clearly demonstrated the involvement of each, as to crucial facts such as time, location, felonious activity, and

---

[3] Each of the confessions was subjected to a process of redaction in which references by the confessing defendant to other defendants were replaced with the words "blank" or "another person."  As the Court of Appeals for the Sixth Circuit observed below, the confessions were nevertheless "such as to leave no possible doubt in the jurors' minds concerning the 'person[s]' referred to."  575 F. 2d, at 1180.

awareness of the overall plan or scheme." App. 245. Accordingly, the Tennessee Supreme Court concluded: "The fact that jointly tried codefendants have confessed precludes a violation of the *Bruton* rule where the confessions are similar in material aspects." *Ibid.*, quoting *State* v. *Elliott,* 524 S. W. 2d 473, 477–478 (Tenn. 1975).

The United States District Court for the Western District of Tennessee thereafter granted respondents' applications for writs of habeas corpus, ruling that their rights under *Bruton* had been violated and that introduction of respondent Pickens' uncounseled written confession had violated his rights under *Miranda* v. *Arizona, supra.* The Court of Appeals for the Sixth Circuit affirmed, holding that admission of the confessions violated the rule announced in *Bruton* and that the error was not harmless since the evidence against each respondent, even considering his confession, was "not so overwhelming as to compel the jury verdict of guilty . . . ." 575 F. 2d 1178, 1182 (1978). The Court of Appeals frankly acknowledged that its decision conflicts with decisions of the Court of Appeals for the Second Circuit holding the *Bruton* rule inapplicable "[w]here the jury has heard not only a codefendant's confession but the defendant's own [interlocking] confession . . . ." *United States ex rel. Catanzaro* v. *Mancusi,* 404 F. 2d 296, 300 (1968), cert. denied, 397 U. S. 942 (1970). Accord, *United States ex rel. Stanbridge* v. *Zelker,* 514 F. 2d 45, 48–50, cert. denied, 423 U. S. 872 (1975); *United States ex rel. Duff* v. *Zelker,* 452 F. 2d 1009, 1010 (1971), cert. denied, 406 U. S. 932 (1972). We granted certiorari in this case to resolve that conflict.[4] 439 U. S. 978 (1978).

---

[4] The conflict extends throughout the Courts of Appeals. The Courts of Appeals for the Third and Sixth Circuits have expressly ruled that the *Bruton* rule applies in the context of interlocking confessions, see *Hodges* v. *Rose,* 570 F. 2d 643 (CA6 1978); *United States* v. *DiGilio,* 538 F. 2d 972, 981–983 (CA3 1976), cert. denied *sub nom. Lupo* v. *United States,* 429 U. S. 1038 (1977), and the Court of Appeals for the Ninth Circuit has

## II

In *Delli Paoli* v. *United States,* 352 U. S. 232 (1957), a nontestifying codefendant's confession, which incriminated a defendant who had not confessed, was admitted at a joint trial over defendant's hearsay objection. Concluding that "it was reasonably possible for the jury to follow" the trial court's instruction to consider the confession only against the declarant, this Court held that admission of the confession did not constitute reversible error. Little more than a decade later, however, *Delli Paoli* was expressly overruled in *Bruton* v. *United States.* In that case, defendants Bruton and Evans were convicted of armed postal robbery after a joint trial. Although Evans did not take the stand, a postal inspector was allowed to testify that Evans had orally confessed to having committed the robbery with Bruton. The trial judge instructed the jury that Evans' confession was competent evidence against Evans, but was inadmissible hearsay against

done so impliedly, see *Ignacio* v. *Guam,* 413 F. 2d 513, 515–516 (1969), cert. denied, 397 U. S. 943 (1970). In addition to the Court of Appeals for the Second Circuit, at least four other Courts of Appeals have rejected the *Bruton* claims of confessing defendants. Cases from the Fifth and Seventh Circuits have reasoned that the *Bruton* rule does not apply in the context of interlocking confessions and that, even if it does, the error was harmless beyond a reasonable doubt. See *Mack* v. *Maggio,* 538 F. 2d 1129, 1130 (CA5 1976); *United States* v. *Spinks,* 470 F. 2d 64, 65–66 (CA7), cert. denied, 409 U. S. 1011 (1972). Two other Courts of Appeals have rejected the *Bruton* claims of confessing defendants, refusing to concern themselves "with the legal nicety as to whether the . . . case is 'without' the *Bruton* rule, or is 'within' *Bruton* [and] the violation thereof constitut[es] only harmless error." *Metropolis* v. *Turner,* 437 F. 2d 207, 208–209 (CA10 1971); accord, *United States* v. *Walton,* 538 F. 2d 1348, 1353–1354 (CA8), cert. denied, 429 U. S. 1025 (1976). State-court decisions in this area are in similar disarray. Compare, *e. g., Stewart* v. *State,* 257 Ark. 753, 519 S. W. 2d 733 (1975), and *People* v. *Moll,* 26 N. Y. 2d 1, 256 N. E. 2d 185, cert. denied *sub nom. Stanbridge* v. *New York,* 398 U. S. 911 (1970), with *People* v. *Rosochacki,* 41 Ill. 2d 483, 244 N. E. 2d 136 (1969), and *State* v. *Oliver,* 160 Conn. 85, 273 A. 2d 867 (1970).

Bruton and therefore could not be considered in determining Bruton's guilt.

This Court reversed Bruton's conviction, noting that despite the trial court's admittedly clear limiting instruction, "the introduction of Evans' confession added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination." 391 U. S., at 127–128. Bruton was therefore held to have been denied his Sixth Amendment right of confrontation. The *Bruton* court reasoned that although in many cases the jury can and will follow the trial judge's instruction to disregard inadmissible evidence,

> "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed." *Id.,* at 135–136 (citations and footnotes omitted).

One year after *Bruton* was decided, this Court rejected the notion that erroneous admission at a joint trial of evidence such as that introduced in *Bruton* automatically requires reversal of an otherwise valid conviction. See *Harrington* v. *California,* 395 U. S. 250 (1969). In some cases, the properly

admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission so insignificant by comparison, that it is clear beyond a reasonable doubt that introduction of the admission at trial was harmless error.[5]

---

[5] In *Harrington* v. *California*, 395 U. S. 250 (1969), four defendants were found guilty of murder after a joint trial. Defendant Harrington's extrajudicial statements placed him at the scene of the crime, but "fell short of a confession." *Id.*, at 252. His three codefendants, however, confessed, and their confessions were introduced at trial with the instruction that the jury was to consider each confession only against its source. One of Harrington's codefendants, whose confession implicated Harrington, took the stand and was subject to cross-examination. The other two codefendants, whose statements corroborated Harrington's admitted presence at the scene of the crime, did not take the stand. Noting the overwhelming evidence of Harrington's guilt, and the relatively insignificant prejudicial impact of his codefendants' statements, the Court held that "the lack of opportunity to cross-examine [the non-testifying co-defendants] constituted harmless error under the rule of *Chapman* [v. *California*, 386 U. S. 18 (1967)]." *Id.*, at 253.

On two subsequent occasions, this Court has applied the harmless-error doctrine to claimed violations of *Bruton*. In *Schneble* v. *Florida*, 405 U. S. 427 (1972), Schneble and a codefendant were found guilty of murder following a joint trial. Although neither defendant took the stand, police officers were allowed to testify as to a detailed confession given by Schneble and a statement given by his codefendant which tended to corroborate certain portions of Schneble's confession. We assumed, without deciding, that admission of the codefendant's statement had violated *Bruton*, but held that in view of the overwhelming evidence of Schneble's guilt and the comparatively insignificant impact of the codefendant's statement, "any violation of *Bruton* that *may* have occurred at petitioner's trial was harmless [error] beyond a reasonable doubt." 405 U. S., at 428 (emphasis added).

In *Brown* v. *United States*, 411 U. S. 223 (1973), the prosecution introduced police testimony regarding extrajudicial statements made by two nontestifying codefendants. Each statement implicated both of the codefendants in the crimes charged. Neither codefendant took the stand, and the police testimony was admitted into evidence at their joint trial. Because the Solicitor General conceded that the statements were admitted into evidence in violation of *Bruton*, we had no occasion to consider the question whether introduction of the interlocking confessions violated

Petitioner urges us to follow the reasoning of the Court of Appeals for the Second Circuit and to hold that the *Bruton* rule does not apply in the context of interlocking confessions. Alternatively, he contends that if introduction of interlocking confessions at a joint trial does violate *Bruton,* the error is all but automatically to be deemed harmless beyond a reasonable doubt. We agree with petitioner that admission at the joint trial of respondents' interlocking confessions did not infringe respondents' right of confrontation secured by the Sixth and Fourteenth Amendments to the United States Constitution, but prefer to cast the issue in a slightly broader form than that posed by petitioner.

*Bruton* recognized that admission at a joint trial of the incriminating extrajudicial statements of a nontestifying codefendant can have "devastating" consequences to a non-confessing defendant, adding "substantial, perhaps even critical, weight to the Government's case." 391 U. S., at 128. Such statements go to the jury untested by cross-examination and, indeed, perhaps unanswered altogether unless the defendant waives his Fifth Amendment privilege and takes the stand. The prejudicial impact of a codefendant's confession upon an incriminated defendant who has, insofar as the jury is concerned, maintained his innocence from the beginning is simply too great in such cases to be cured by a limiting instruction. The same cannot be said, however, when the defendant's own confession—"probably the most probative and damaging evidence that can be admitted against him," *id.,* at 139 (WHITE, J., dissenting)—is properly introduced at trial. The defendant is "the most knowledgeable and unimpeachable source of information about his past conduct," *id.,* at 140

---

*Bruton.* Proceeding from the Solicitor General's concession, we held that the police testimony "was merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury." 411 U. S., at 231. Thus, any *Bruton* error was harmless beyond a reasonable doubt.

(WHITE, J., dissenting), and one can scarcely imagine evidence more damaging to his defense than his own admission of guilt. Thus, the incriminating statements of a codefendant will seldom, if ever, be of the "devastating" character referred to in *Bruton* when the incriminated defendant has admitted his own guilt. The right protected by *Bruton*—the "constitutional right of cross-examination," *id.*, at 137—has far less practical value to a defendant who has confessed to the crime than to one who has consistently maintained his innocence. Successfully impeaching a codefendant's confession on cross-examination would likely yield small advantage to the defendant whose own admission of guilt stands before the jury unchallenged. Nor does the natural "motivation to shift blame onto others," recognized by the *Bruton* Court to render the incriminating statements of codefendants "inevitably suspect," *id.*, at 136, require application of the *Bruton* rule when the incriminated defendant has corroborated his codefendant's statements by heaping blame onto himself.

The right of confrontation conferred by the Sixth Amendment is a safeguard to ensure the fairness and accuracy of criminal trials, see *Dutton* v. *Evans*, 400 U. S. 74, 89 (1970), and its reach cannot be divorced from the system of trial by jury contemplated by the Constitution. A crucial assumption underlying that system is that juries will follow the instructions given them by the trial judge. Were this not so, it would be pointless for a trial court to instruct a jury, and even more pointless for an appellate court to reverse a criminal conviction because the jury was improperly instructed. The Confrontation Clause has never been held to bar the admission into evidence of every relevant extrajudicial statement made by a nontestifying declarant simply because it in some way incriminates the defendant. See, *e. g.*, *id.*, at 80; *Mattox* v. *United States*, 156 U. S. 237, 240–244 (1895). And an instruction directing the jury to consider a codefendant's extrajudicial statement only against its source has been found sufficient to

avoid offending the confrontation right of the implicated defendant in numerous decisions of this Court.[6]

When, as in *Bruton,* the confessing codefendant has chosen not to take the stand and the implicated defendant has made no extrajudicial admission of guilt, limiting instructions cannot be accepted as adequate to safeguard the defendant's rights under the Confrontation Clause. Under such circumstances, the "practical and human limitations of the jury system," *Bruton* v. *United States, supra,* at 135, override the theoretically sound premise that a jury will follow the trial court's instructions. But when the defendant's own confession is properly before the jury, we believe that the constitutional scales tip the other way. The possible prejudice resulting from the failure of the jury to follow the trial court's instructions is not so "devastating" or "vital" to the confessing defendant to require departure from the general rule allowing admission of evidence with limiting

---

[6] In *Opper* v. *United States,* 348 U. S. 84 (1954), petitioner contended that the trial court had erred in overruling his motion for severance, arguing that the jury may have improperly considered statements of his codefendant, which were inadmissible as to petitioner, in finding petitioner guilty. This Court rejected the contention:

"It was within the sound discretion of the trial judge as to whether the defendants should be tried together or severally and there is nothing in the record to indicate an abuse of such discretion when petitioner's motion for severance was overruled. The trial judge here made clear and repeated admonitions to the jury at appropriate times that Hollifield's incriminatory statements were not to be considered in establishing the guilt of the petitioner. To say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict. Our theory of trial relies upon the ability of a jury to follow instructions. There is nothing in this record to call for reversal because of any confusion or injustice arising from the joint trial. The record contains substantial competent evidence upon which the jury could find petitioner guilty." *Id.,* at 95 (footnote omitted).

See, *e. g., Blumenthal* v. *United States,* 332 U. S. 539, 552–553 (1947).

instructions.[7] We therefore hold that admission of interlocking confessions with proper limiting instructions conforms to the requirements of the Sixth and Fourteenth Amendments to the United States Constitution.[8] Accordingly, the judg-

[7] MR. JUSTICE STEVENS characterizes our decision as an attempt "to create a vaguely defined exception" to the *Bruton* rule for cases involving interlocking confessions, *post,* at 82, and suggests that the "proposed exception" is designed "to limit the effect of [the *Bruton*] rule to the largely irrelevant set of facts in the case that announced it." *Post,* at 87. First, the dissent describes what we believe to be the "rule" as the "exception." The "rule"—indeed, the premise upon which the system of jury trials functions under the American judicial system—is that juries can be trusted to follow the trial court's instructions. *Bruton* was an exception to this rule, created because of the "devastating" consequences that failure of the jury to disregard a codefendant's inculpatory confession could have to a nonconfessing defendant's case. We think it entirely reasonable to apply the general rule, and not the *Bruton* exception, when the defendant's case has already been devastated by his own extrajudicial confession of guilt.

Second, under the reasoning of *Bruton,* its facts were anything but "irrelevant" to its holding. The *Bruton* Court recognized:

"[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. . . . Such a context is presented here . . . ." 391 U. S., at 135.

Clearly, *Bruton* was tied to the situation in which it arose: "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." *Id.,* at 135–136.

[8] MR. JUSTICE STEVENS, in dissent, states that our holding "squarely overrule[s]" this Court's decisions in *Roberts* v. *Russell,* 392 U. S. 293 (1968); *Hopper* v. *Louisiana,* 392 U. S. 658 (1968); *Brown* v. *United States,* 411 U. S. 223 (1973); and *Harrington* v. *California,* 395 U. S. 250 (1969). "In all four of these cases," according to the dissent, "the Court found a *Bruton* error even though the defendants' confessions interlocked." *Post,* at 83 n. 3. We disagree.

We think that the dissent fails both to note significant factual distinctions between the present case and *Roberts* v. *Russell, supra,* and to recognize the difference in precedential value between decisions of this

ment of the Court of Appeals as to respondents Hamilton and Randolph is reversed.

### III

The Court of Appeals affirmed the District Court's granting of habeas corpus relief to respondent Pickens on the additional

Court which have been fully argued and disposed of on their merits and unargued summary dispositions, a difference which we noted in *Edelman* v. *Jordan,* 415 U. S. 651, 670–671 (1974). In *Roberts* "[t]he facts parallel[ed] the facts in *Bruton.*" 392 U. S., at 293. Petitioner was convicted of armed robbery after a joint trial in which a codefendant's confession inculpating petitioner was introduced through the testimony of a police officer. Petitioner's cousin testified at trial that petitioner had "indicated that he thought . . . Tennessee was an easy place to commit a robbery." App. to Brief in Opposition, O. T. 1967, No. 920, Misc., p. 4. This extrajudicial statement, while inculpatory, was by no stretch of the imagination a "confession." The District Court denied petitioner's application for a writ of habeas corpus, expressly relying on the authority of *Delli Paoli* v. *United States,* 352 U. S. 232 (1957), and the Court of Appeals affirmed. This Court subsequently overruled *Delli Paoli* in *Bruton,* and granted the petition for certiorari in *Roberts* to consider "the question whether *Bruton* [was] to be applied retroactively." *Roberts* v. *Russell, supra,* at 293. The Court decided the question affirmatively, vacated the judgment of the Court of Appeals, and remanded the case to the District Court for further consideration in light of *Bruton,* in no way passing on the merits of petitioner's *Bruton* claim. Thus, *Roberts,* contrary to the dissent's reading, neither involved interlocking confessions nor "found a *Bruton* error."

*Hopper* v. *Louisiana, supra,* came to this Court in much the posture as *Roberts.* Petitioners' manslaughter convictions were affirmed by the Louisiana Supreme Court when *Delli Paoli* was still good law, but while their petition for certiorari was pending before this Court, *Bruton* was decided. In a two-sentence summary disposition, this Court granted petitioners' petition for certorari, vacated the judgment of the Louisiana Supreme Court, and remanded the case "for further consideration in light of *Bruton* v. *United States,* 391 U. S. 123, and *Roberts* v. *Russell,* [392 U. S.] 293." 392 U. S., at 658. Not having passed on the merits of petitioners' *Bruton* claim, this Court can hardly be said to have "found a *Bruton* error" in *Hopper.*

The dissent, we believe, likewise misreads *Harrington* v. *Califonia, supra,* and *Brown* v. *United States, supra,* as our discussion of those cases in n. 5, *supra,* reveals.

ground that his rights under *Miranda* v. *Arizona,* 384 U. S. 436 (1966), had been violated. Although petitioner sought review of this ruling, our grant of certiorari was limited to the *Bruton* issue. We thus have no occasion to pass on the merits of the Court of Appeals' *Miranda* ruling. Accordingly, the judgment of the Court of Appeals as to respondent Pickens is affirmed.

*Affirmed in part and reversed in part.*

MR. JUSTICE POWELL took no part in the consideration or decision of this case.

MR. JUSTICE BLACKMUN, concurring in part and concurring in the judgment.

I join Parts I and III of the principal opinion and concur in the Court's judgment affirming in part and reversing in part the judgment of the Court of Appeals.

For me, any error that existed in the admission of the confessions of the codefendants, in violation of *Bruton* v. *United States,* 391 U. S. 123 (1968), was, on the facts of this case, clearly harmless beyond a reasonable doubt. I refrain from joining Part II of the principal opinion because, as I read it, it abandons the harmless-error analysis the Court previously has applied in similar circumstances and now adopts a *per se* rule to the effect that *Bruton* is inapplicable in an interlocking confession situation.

In *Bruton,* of course, the Court held that the admission in a joint trial of the confession of a codefendant who did not take the stand violated the Sixth Amendment confrontation right of the other defendant. Because in most cases the impact of admitting a codefendant's confession is severe, and because the credibility of any such confession "is inevitably suspect," *id.,* at 136, the Court went on to hold that a limiting jury instruction could not alleviate the resultant substantial threat to a fair trial the Confrontation Clause was designed to protect. *Id.,* at 136–137.

In *Harrington* v. *California,* 395 U. S. 250 (1969), however, the Court recognized that evidence of guilt could be sufficiently overwhelming so as to render any *Bruton* error "harmless beyond a reasonable doubt," under *Chapman* v. *California,* 386 U. S. 18 (1967). Reversal of a conviction, then, was not required merely because of the existence of a *Bruton* error. The Court applied a similar harmless-error analysis in *Schneble* v. *Florida,* 405 U. S. 427 (1972), a case concerning the defendant's own confession and a partially corroborating statement given by a nontestifying codefendant.

In the present case, the principal opinion appears to me to depart from this harmless-error approach and analysis to hold that *Bruton* simply does not apply in a case involving interlocking confessions. It concludes that in circumstances where one defendant has confessed, the interlocking confession of a codefendant "will seldom, if ever, be of the 'devastating' character referred to in *Bruton.*" *Ante,* at 73. Similarly, it finds that the fact that the confession of a codefendant is "inevitably suspect" is of little weight where interlocking confessions are in evidence. *Ibid.* Thus, it holds that the right protected by *Bruton, i. e.,* the Confrontation Clause right of cross-examination, "has far less practical value to a defendant who has confessed to the crime than to one who has consistently maintained his innocence." *Ibid.* Accordingly, it concludes "that admission of interlocking confessions with proper limiting instructions conforms to the requirements" of the Constitution. *Ante,* at 75.

The Court has not departed heretofore from a harmless-error approach in *Bruton* cases. It is unclear where the present analysis will lead in cases where interlocking confessions are not in issue, but where any *Bruton* error appears harmless under *Chapman;* for where the *Bruton* error is harmless, the error in admitting the nontestifying codefendant's confession will be far from devastating. I would be unwilling to depart from the traditional harmless-error anal-

ysis in the straightforward *Bruton*-error situation. Neither would I depart from the harmless-error approach in interlocking confession cases. The fact that confessions may interlock to some degree does not ensure, as a *per se* matter, that their admission will not prejudice a defendant so substantially that a limiting instruction will not be curative. The two confessions may interlock in part only. Or they may cover only a portion of the events in issue at the trial. Although two interlocking confessions may not be internally inconsistent, one may go far beyond the other in implicating the confessor's codefendant. In such circumstances, the admission of the confession of the codefendant who does not take the stand could very well serve to prejudice the defendant who is incriminated by the confession, notwithstanding that the defendant's own confession is, to an extent, interlocking. I fully recognize that in most interlocking-confession cases, any error in admitting the confession of a nontestifying codefendant will be harmless beyond a reasonable doubt. Even so, I would not adopt a rigid *per se* rule that forecloses a court from weighing all the circumstances in order to determine whether the defendant in fact was unfairly prejudiced by the admission of even an interlocking confession. Where he was unfairly prejudiced, the mere fact that prejudice was caused by an interlocking confession ought not to override the important interests that the Confrontation Clause protects.

It is possible, of course, that the new approach will result in no more than a shift in analysis. Instead of focusing on whether the error was harmless, defendants and courts will be forced, instead, to inquire whether the confessions were sufficiently interlocking so as to permit a conclusion that *Bruton* does not apply. And I suppose that after making a determination that the confessions did not interlock to a sufficient degree, the court then would have to make a harmless-

error determination anyway, thus adding another step to the process.

Unfortunately, it is not clear that the new approach mandates even an inquiry whether the confessions interlock. Respondents have argued that the confessions in this case, in fact, did not interlock. Brief for Respondents 34–38. The principal opinion, however, simply assumes the interlock. It thus comes close to saying that so long as all the defendants have made some type of confession which is placed in evidence, *Bruton* is inapplicable without inquiry into whether the confessions actually interlock and the extent thereof. If it is willing to abandon the factual inquiry that accompanies a harmless-error determination, it should be ready, at least, to substitute an inquiry into whether there is genuine interlocking before it casts the application of *Bruton,* and the underlying Confrontation Clause right, completely aside.

I merely add that in this case, any *Bruton* error, in my view, clearly was harmless. The principal issue concerning respondents at trial was whether three Negro males identified by a number of witnesses as having been at the murder scene were indeed the respondents. Each confession placed the confessing respondent at the scene of the killing. Each confession implicated the confessor in the Woods' plan to rob the poker game. Each confession largely overlapped with and was cumulative to the others. Corroborative testimony from witnesses who were in the apartment placed respondent Hamilton at the scene of the murder and tentatively identified respondent Randolph as one of the Negroes who received a share of the proceeds in Hamilton's apartment immediately after the killing. The testimony of five witnesses to the events outside the apartment strongly corroborated the confessions. In these circumstances, considering the confession of each respondent against him, I cannot believe that "there is a reasonable possibility that the improperly admitted evidence contributed to the conviction."

*Schneble* v. *Florida*, 405 U. S., at 432.   Reversal on the *Bruton* issue, therefore, is required.

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

As MR. JUSTICE BLACKMUN makes clear, *ante*, at 77–78, proper analysis of this case requires that we differentiate between (1) a conclusion that there was no error under the rule of *Bruton* v. *United States,* 391 U. S. 123, and (2) a conclusion that even if constitutional error was committed, the possibility that inadmissible evidence contributed to the conviction is so remote that we may characterize the error as harmless.   Because MR. JUSTICE BLACKMUN properly rejects the first conclusion, my area of disagreement with him is narrow.   In my view, but not in his, the concurrent findings of the District Court and the Court of Appeals that the error here was not harmless [1] preclude this Court from reaching a

---

[1] As Judge Edwards noted, writing for the Court of Appeals:

"In evaluating the question of harmless error in this case, it is important to point out the factors which might affect a jury's verdict in relation to these three defendants in separate trials where the *Bruton* rule was observed:

"1) Randolph, Pickens and Hamilton were not involved in the gambling game between Douglas, the Las Vegas gambler, and Robert Wood, the hometown gambler who got cheated.

"2) They were not involved in originating the plan for recouping Robert Wood's losses.

"3) They were not in the room (and had not been) when Robert Wood killed Douglas.

"4) Indeed, the jury could conclude from the admissible evidence in this case that when Joe Wood pulled out his pistol, the original plan for three 'unknown' blacks to rob the all-white poker game was aborted and that petitioners' subsequent entry into the room did not involve them in the crime of murder.

"Additionally, if we return to consideration of the joint trial, that jury as charged by the state court judge had the responsibility of determining whether or not any of the three confessions testified to by Memphis police was voluntarily given.   Assuming that two of the three confessions had

different result on this kind of issue. *E. g., Berenyi* v. *Immigration Director,* 385 U. S. 630, 635; *Graver Tank & Mfg. Co.* v. *Linde Air Products Co.,* 336 U. S. 271, 275. But see opinion of MR. JUSTICE BLACKMUN, *ante,* at 80–81.

My area of disagreement with the plurality opinion is far wider and prompts more extended remarks. The plurality adopts the first conclusion above—that no constitutional error was committed when the confessions of all three respondents were admitted into evidence at their joint trial. Without purporting to modify the *Bruton* rule precluding the use of a nontestifying codefendant's extrajudicial admissions against a defendant in a joint trial, the plurality reaches this conclusion by attempting to create a vaguely defined exception for cases in which there is evidence that the defendant has also made inculpatory statements which he does not repudiate at trial.[2]

If ever adopted by the Court, such an exception would

---

been removed from jury consciousness by adherence to *Bruton,* we find it impossible to conclude that the jury finding and ultimate verdict would, 'beyond reasonable doubt,' have been the same.

"These factors serve to distinguish this case from *Harrington* v. *California,* [395 U. S. 250,] and *Schneble* v. *Florida,* [405 U. S. 427,] and to convince us that the *Bruton* errors found by the District Judge cannot (as he also held) be determined to be harmless beyond reasonable doubt." 575 F. 2d 1178, 1182–1183.

[2] As MR. JUSTICE BLACKMUN points out, *ante,* at 78–79, it is unclear whether the plurality restricts its analysis to "interlocking" confessions, opinion of MR. JUSTICE REHNQUIST, *ante,* at 75 (and, if so, what an "interlock" is), or whether a "broader" exception is established for *all* confessions. *Ante,* at 72. Indeed, its opinion does not explain how inculpatory a statement must be before it qualifies as a "confession," an "extrajudicial admission of guilt," or a "statemen[t] . . . heaping blame onto [oneself]." *Ante,* at 73, 74. Moreover, the plurality variously states its test as applicable "when[ever] the incriminated defendant has [once] admitted his own guilt" (*i. e.,* whenever he has not "maintained his innocence from the beginning"), or only when he has once confessed *and* has left his "admission of guilt . . . before the jury unchallenged" by any evidence of its invalidity. *Ante,* at 72, 73.

seriously undercut the Court's decision in *Bruton* by limiting its effect to a small and arbitrarily selected class of cases. Indeed, its adoption would squarely overrule holdings in four decisions of this Court that applied the rule of *Bruton*.[3]

---

[3] In *Roberts* v. *Russell,* 392 U. S. 293, petitioner and a codefendant were jointly tried and convicted of armed robbery, to which the codefendant had confessed, implicating petitioner. In addition, petitioner's cousin testified that petitioner made certain inculpatory statements to him concerning the robbery—statements that the State Supreme Court relied upon heavily in upholding the jury finding of petitioner's guilt. App. to Brief in Opposition, O. T. 1967, No. 920, Misc., pp. 4, 6. That court also held that the redaction of the codefendant's confession to omit the references to petitioner as well as a cautionary instruction to the jury to consider the confession as evidence against the codefendant alone was sufficient to avoid any problem under the Confrontation Clause. On habeas corpus, the District Court and the Court of Appeals agreed. This Court granted the writ of certiorari and summarily vacated the conviction and remanded for reconsideration in light of *Bruton.* In so doing, it established both that the *Bruton* rule applied to the States and that it was retroactive. 392 U. S., at 294–295.

Similarly, in *Hopper* v. *Louisiana,* 392 U. S. 658, the Court vacated the convictions of two defendants both of whom had made full confessions that were introduced at their joint trial with the usual cautionary instructions. See 251 La. 77, 104, 203 So. 2d 222, 232–233 (1967). On remand, the Louisiana Supreme Court held that the *Bruton* errors as to both defendants were harmless beyond a reasonable doubt in light of the overwhelming untainted evidence inculpating both, 253 La. 439, 218 So. 2d 551 (1969), and this Court denied certiorari. 396 U. S. 1012.

In two subsequent decisions, the Court held that error had been committed under the rule of *Bruton,* although it found the error to be harmless. *Brown* v. *United States,* 411 U. S. 223, 230–231; *Harrington* v. *California,* 395 U. S. 250, 254. In all four of these cases the Court found a *Bruton* error even though the defendants' confessions interlocked.

The plurality's analysis is also inconsistent with almost half of the lower federal and state court opinions relied on in *Bruton* in support of its reasoning. 391 U. S., at 129, 135, and nn. 4, 8, 9. In 6 of the 14 cases cited there, the defendant as well as the codefendant had confessed. See *United States ex rel. Floyd* v. *Wilkins,* 367 F. 2d 990 (CA2 1966); *Greenwell* v. *United States,* 119 U. S. App. D. C. 43, 336 F. 2d 962 (1964); *Barton* v. *United States,* 263 F. 2d 894 (CA5 1959); *United States ex rel. Hill*

Evidence that a defendant has made an "extrajudicial admission of guilt" which "stands before the jury unchallenged," *ante*, at 74, 73, is not an acceptable reason for depriving him of his constitutional right to confront the witnesses against him.[4] In arguing to the contrary, and in striving "to cast the issue" presented "in a . . . broader form" than any of the parties felt necessary to dispose of the case, *ante*, at 72, the plurality necessarily relies on two assumptions. Both are erroneous. First, it assumes that the jury's ability to disregard a codefendant's inadmissible and highly prejudicial confession is invariably increased by the existence of a corroborating statement by the defendant. Second, it assumes that all unchallenged confessions by a defendant are equally reliable. Aside from two quotations from the dissent in *Bruton*, however, the plurality supports these assumptions with nothing more than the force of its own assertions. But the infinite variability of inculpatory statements (whether made by defendants or codefendants), and of their likely effect on juries, makes those assertions untenable. A hypothetical example is instructive.

Suppose a prosecutor has 10 items of evidence tending to prove that defendant X and codefendant Y are guilty of assassinating a public figure. The first is the tape of a televised interview with Y describing in detail how he and X planned and executed the crime. Items 2 through 9 involve circumstantial evidence of a past association between X and Y, a shared hostility for the victim, and an expressed wish for his early demise—evidence that in itself might very well be insufficient to convict X. Item 10 is the testimony of a drinking partner, a former cellmate, or a divorced spouse of X who vaguely recalls X saying that he had been with Y

---

v. *Deegan*, 268 F. Supp. 580 (SDNY 1967); *People* v. *Barbaro*, 395 Ill. 264, 69 N. E. 2d 692 (1946); *People* v. *Fisher*, 249 N. Y. 419, 432, 164 N. E. 336, 341 (1928) (Lehman, J., dissenting).

[4] The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

at the approximate time of the killing. Neither X nor Y takes the stand.

If Y's televised confession were placed before the jury while Y was immunized from cross-examination, it would undoubtedly have the "devastating" effect on X that the *Bruton* rule was designed to avoid. 391 U. S., at 128. As MR. JUSTICE STEWART's characteristically concise explanation of the underlying rationale in that case demonstrates, it would also plainly violate X's Sixth Amendment right to confront his accuser.[5] Nevertheless, under the plurality's first remarkable assumption, the prejudice to X—and the violation of his constitutional right—would be entirely cured by the subsequent use of evidence of his own ambiguous statement. In my judgment, such dubious corroboration would enhance, rather than reduce, the danger that the jury would rely on Y's televised confession when evaluating X's guilt. See *United States* v. *Bozza,* 365 F. 2d 206, 215 (CA2 1966) (Friendly, J.), quoted in n. 13, *infra.* Even if I am wrong, however, there is no reason to conclude that the prosecutor's reliance on item 10 would obviate the harm flowing from the use of item 1.

The dubiousness of X's confession in this example—as in any case in which the defendant's inculpatory statement is

---

[5] "I think it clear that the underlying rationale of the Sixth Amendment's Confrontation Clause precludes reliance upon cautionary instructions when the highly damaging out-of-court statement of a codefendant, who is not subject to cross-examination, is deliberately placed before the jury at a joint trial. A basic premise of the Confrontation Clause, it seems to me, is that certain kinds of hearsay (see, *e. g., Pointer* v. *Texas,* 380 U. S. 400; *Douglas* v. *Alabama,* 380 U. S. 415) are at once so damaging, so suspect, and yet so difficult to discount, that jurors cannot be trusted to give such evidence the minimal weight it logically deserves, *whatever* instructions the trial judge might give. See the Court's opinion, [391 U. S.,] at 136 n. 12. It is for this very reason that an out-of-court accusation is universally conceded to be constitutionally *inadmissible* against the accused, rather than admissible for the little it may be worth." 391 U. S., at 137–138 (STEWART, J., concurring).

ambiguous, incomplete, the result of coercive influences, or simply the product of the well-recognized and often untrustworthy "urge to confess" [6]—illustrates the inaccuracy of the plurality's second crucial assumption. It is no doubt true that in some cases a defendant's confession will constitute such convincing evidence of his guilt that the violation of his constitutional rights is harmless beyond a reasonable doubt. *E. g., Brown v. United States,* 411 U. S. 223; *Schneble v. Florida,* 405 U. S. 427. But in many cases, it is not so convincing. Moreover, such evidence is not inherently more incriminating or more reliable than other kinds of evidence such as fingerprints, photographs, or eyewitness testimony. Yet, if these types of corroboration are given the same absolute effect that the plurality would accord confessions, the *Bruton* rule would almost never apply.[7]

I am also at a loss to understand the relevance of X's failure to "challenge" his confession at trial. *Ante,* at 73. For there is nothing he could say or not say about his own alleged confession that would dispel the dramatically damning effect of Y's. Furthermore, even apart from the general rule that a defendant should not be penalized for exercising one right (in this case the right not to take the stand or to introduce other evidence) by having another taken away (in this case the right to confront one's accuser), *e. g., United States v. Jackson,* 390 U. S. 570, it is unclear why X's failure to repudiate it necessarily enhances the reliability of a self-impeaching "confession" such as the one hypothesized above. Cf. *Lakeside v. Oregon,* 435 U. S. 333, 343–344 (STEVENS, J., dissenting).

---

[6] *E. g.,* Foster, Confessions and the Station House Syndrome, 18 DePaul L. Rev. 683 (1969); Sterling, Police Interrogation and the Psychology of Confession, 14 J. Pub. L. 25 (1965). See generally T. Reik, The Compulsion to Confess 267 (1959).

[7] Indeed, George Bruton was identified at trial as the perpetrator by an eyewitness to the robbery. App. in *Bruton v. United States,* O. T. 1967, No. 705, p. 70.

In short, I see no logic to commend the proposed exception to the rule of *Bruton* save, perhaps, a purpose to limit the effect of that rule to the largely irrelevant set of facts in the case that announced it. If relevant at all in the present context, the factors relied on by the plurality support a proposition no one has even remotely advocated in this case— that the corroborated evidence used in this case was so trustworthy that it should have been fully admissible against all of the defendants, and the jury instructed as much. Conceivably, corroborating or other circumstances surrounding otherwise inadmissible hearsay may so enhance its reliability that its admission in evidence is justified in some situations.[8] But before allowing such a rule to defeat a defendant's fundamental right to confront his accusers, this Court surely should insist upon a strong showing not only of the reliability of the hearsay in the particular case but also of the impossibility, or at least difficulty, of making the accusers available for cross-examination.[9] And, in most cases the prosecution will be hard pressed to make the latter showing in light of its ability to try the defendant and codefendant separately and to afford each immunity from the use against him of his testimony at the other's trial. See *Kastigar* v. *United States*, 406 U. S. 441.

Absent admissibility of the codefendants' confessions against respondents, therefore, the controlling question must be whether it is realistic to assume that the jury followed the judge's instructions to disregard those confessions when it was

---

[8] Cf. Fed. Rule Evid. 804 (b) (3) ("A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement"); *Chambers* v. *Mississippi*, 410 U. S. 284.

[9] See *Berger* v. *California*, 393 U. S. 314; *Barber* v. *Page*, 390 U. S. 719; *Pointer* v. *Texas*, 380 U. S. 400; *Motes* v. *United States*, 178 U. S. 458; Rule 804 (b), *supra* n. 8. See generally Westen, Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases, 91 Harv. L. Rev. 567, 582–586, and n. 43 (1978).

evaluating respondents' guilt. The plurality would answer this question affirmatively. But in so doing, it would repudiate much that has been said by the Court and by an impressive array of judicial and scholarly authorities who have addressed the issue.

As the plurality sees it, the answer to this question is supplied by the "crucial assumption underlying [the jury] system . . . that juries will follow the instructions given them by the trial judge." *Ante*, at 73. This assumption, it is argued, has been applied in "numerous decisions of this Court" regarding codefendants' confessions. *Ante*, at 74, and n. 6, citing *Opper* v. *United States*, 348 U. S. 84, and *Blumenthal* v. *United States*, 332 U. S. 539. But this reasoning was advanced just as forcefully in the case that *Bruton* overruled— a case, incidentally, that relied on the same "numerous" decisions that the plurality resurrects in favor of its analysis. See *Delli Paoli* v. *United States*, 352 U. S. 232, 242. What *Bruton* said in response to this reasoning—despite the plurality's contrary assertions, see *ante*, at 70–73—is no less applicable in the present context:

> "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. . . . Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged ac-

complice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed." 391 U. S., at 135–136 (citations and footnotes omitted).

Rather than falling back on once numerous but now discredited decisions, I prefer to stand by the observations about this sort of question by jurists like Felix Frankfurter, Learned Hand,[10] Wiley Rutledge,[11] Robert Jackson,[12] and Henry

---

[10] In his dissenting opinion in *Delli Paoli* v. *United States,* 352 U. S. 232, Mr. Justice Frankfurter commented on the recurring difficulties arising in the trial of two or more persons accused of collaborating in a criminal enterprise when incriminating declarations by one or more of the defendants are not admissible against others. He observed:

"The dilemma is usually resolved by admitting such evidence against the declarant but cautioning the jury against its use in determining the guilt of the others. The fact of the matter is that too often such admonition against misuse is intrinsically ineffective in that the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors. The admonition therefore becomes a futile collocation of words and fails of its purpose as a legal protection to defendants against whom such a declaration should not tell. While enforcing the rule of admitting the declaration solely against a declarant and admonishing the jury not to consider it against other defendants, Judge Learned Hand, in a series of cases, has recognized the psychological feat that this solution of the dilemma demands of juries. He thus stated the problem:

" 'In effect, however, the rule probably furthers, rather than impedes, the search for truth, and this perhaps excuses the device which satisfies form while it violates substance; that is, the recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody else's.' *Nash* v. *United States,* 54 F. 2d 1006, 1007.

". . . The Government should not have the windfall of having the jury be influenced by evidence against a defendant which, as a matter of law, they should not consider but which they cannot put out of their minds." *Id.,* at 247–248.

[11] Writing for the Court in *Blumenthal* v. *United States,* 332 U. S. 539, 559–560, Mr. Justice Rutledge said:

"The grave danger in this case, if any, arose not from the trial court's rulings upon admissibility or from its instructions to the jury. As we have said, these were as adequate as might reasonably be required in a

Friendly,[13] and by scholars like Wigmore and Morgan.[14]   In my judgment, as I think in theirs, the odds that a jury will obey a command to ignore a codefendant's confession [15]—

joint trial.   The danger rested rather in the risk that the jury, in disregard of the court's direction, would transfer, consciously or unconsciously, the effect of the excluded admissions from the case as made against Goldsmith and Weiss across the barrier of the exclusion to the other three defendants.

"That danger was real.   It is one likely to arise in any conspiracy trial and more likely to occur as the number of persons charged together increases.   Perhaps even at best the safeguards provided by clear rulings on admissibility, limitations of the bearing of evidence as against particular individuals, and adequate instructions, are insufficient to ward off the danger entirely.   It is therefore extremely important that those safeguards be made as impregnable as possible."

[12] Referring to the passage quoted from *Blumenthal* in the preceding footnote, Mr. Justice Jackson made his frequently quoted observation:

"The naive assumption that prejudicial effects can be overcome by instructions to the jury, cf. *Blumenthal* v. *United States*, 332 U. S. 539, 559, all practicing lawyers know to be unmitigated fiction."   *Krulewitch* v. *United States*, 336 U. S. 440, 453 (concurring opinion).

[13] "Not even appellate judges can be expected to be so naive as really to believe that all twelve jurors succeeded in performing what Judge L. Hand aptly called 'a mental gymnastic which is beyond, not only their powers, but anybody's else.'   *Nash* v. *United States*, 54 F. 2d 1006, 1007 (2 Cir. 1932).   It is impossible realistically to suppose that when the twelve good men and women had [the codefendant's] confession in the privacy of the jury room, not one yielded to the nigh irresistible temptation to fill in the blanks [caused by the redaction of the defendants' names] with the keys [the other evidence] provided and [to] ask himself the intelligent question to what extent Jones' statement supported [that evidence], or that if anyone did yield, his colleagues effectively persuaded him to dismiss the answers from his mind."   *United States* v. *Bozza*, 365 F. 2d 206, 215.

[14] See 8 J. Wigmore, Evidence § 2272, p. 416 (3d ed. 1940); E. Morgan, Some Problems of Proof Under the Anglo-American System of Litigation 105 (1956).

[15] Indeed, the judge's command to ignore the confession may well assure that any juror who happened to miss the connection to the defendant at first will nonetheless have made it by the time he enters the jury room.   *Lakeside* v. *Oregon*, 435 U. S. 333, 345 (STEVENS, J., dissenting).

whether or not the defendant has himself confessed—are no less stacked against the defendant than was the deck of cards that William Douglas used to Robert Wood's, and ultimately to his own, downfall in the game of chance arranged by Woppy Gaddy. In contests like this, the risk that one player may be confused with another is not insubstantial.

I respectfully dissent.