Filed 9/9/13  P. v. Jones CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C071902 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F1065) |
| v. | |
| JAY MICHAEL JONES, | |
| Defendant and Appellant. | |

A jury found defendant Jay Michael Jones guilty of six counts of child molestation and sustained five allegations of substantial sexual conduct; it acquitted him of a seventh molestation count.  The trial court sustained recidivist allegations.

The trial court sentenced defendant to state prison for 31 years.  As is pertinent to this appeal, it also imposed one fine of $300 under Penal Code section 290.3 (the sex offender fine), among the assessments on which (totaling $840) was a $90 penalty assessment under Government Code section 76104.7 (the DNA penalty assessment).  It

1

then imposed an administrative fee of 15 percent for the collection of the restitution it had ordered. This was in accordance with the recommendations of the probation report.

On appeal, defendant contends the trial court should have dismissed the entire jury panel[1] after five prospective jurors walked out of the courtroom during voir dire when the prosecutor began describing the nature of the crimes. He also asserts his crimes antedate the 2006 increase in the sex offender fine to $300 and enactment of the DNA penalty assessment. Finally, he contends the restitution administrative fee is in excess of that authorized by statute and thus must be reduced to 10 percent. (Pen. Code, § 2085.5.) The People concede the financial issues; we do not find the court abused its discretion in failing to dismiss the jury panel. We shall therefore affirm the judgment as modified.

The facts underlying defendant's convictions are immaterial to this appeal. We therefore omit a summary of them.

## DISCUSSION

### I. The Reaction of the Prospective Jurors Did Not Mandate Dismissing the Panel

#### A. The Incident and the Court's Response

The parties agreed that before commencing voir dire each would make "mini opening statements." Accordingly, the prosecutor began sketching out her case. "[The victim] is now a young woman. However, when she was a young child she was molested by her uncle, the defendant . . . . [¶] You will hear that the defendant went and stayed with [the victim's] mother in Cottonwood for a period of time. His bedroom was up in

---

[1] Although the terms are frequently used interchangeably, the Supreme Court has designated *pool* as the master list of potential jurors assembled from source lists, *venire* as the subgroup of the pool assembled at the courthouse, and *panel* as the subgroup of the venire assigned to a courtroom for voir dire in a particular case. (*People v. Bell* (1989) 49 Cal.3d 502, 520, fn. 3; cf. Code Civ. Proc., § 194 [defining terms " '[m]aster list,' " " '[j]uror pool,' " and " '[t]rial jury panel' "].)

2

the attic, and one evening he asked [the victim] to take a nap with him. During the course of that evening, he kissed her on the mouth using tongue. He had her masturbate him to the point of ejaculation. He orally copulated her, and he had sexual intercourse with her. [¶] About a week later, [the victim] was sleeping in her bedroom. . . . [D]efendant . . . went into her bedroom, rolled her from her side to her back . . . , digitally penetrated her vagina and orally copulated her."

The prosecutor began to describe the next incident when three female prospective jurors announced that they had to leave and started to walk out of the courtroom. The trial court directed them to wait in the hallway. Two more prospective jurors said they wanted to leave as well.

At this point, the trial court stated, "Hang on. Sit down, please. Now, I'm prepared to go through the process, and if you think you are so emotionally distraught at hearing this explanation, I'm not going to force you to stay, but remember what I said: [¶] The fact that [the prosecutor] is telling you what she thinks may be the evidence in this case does not mean that these things are true. It remains to be seen whether these things are true. That's why we're going to have a trial. [¶] So, if you think the mere description of these things is so upsetting to you that you cannot sit by and listen, that these . . . statements alone are . . . so sensitive to you that you cannot listen to this explanation and give the defense the benefit of listening to [its] explanation, then please do step out in the hallway." The two prospective jurors left the courtroom. The prosecutor completed her statement, describing the third incident as involving intercourse when the victim was 11 years old. In response, defense counsel simply asserted "I want to emphasize it is your duty to listen to all the facts of this case before you make up your mind. The evidence will show that none of these acts occurred and the witnesses will testify to that. Thank you." The court then called a recess. It told counsel it intended to

dismiss the prospective jurors who had left the courtroom. Both counsel agreed this was cause for dismissal.

Defense counsel expressed "some concern about whether the rest of the [potential] jurors have been tainted." The judge responded that if counsel was "suggesting that I bring up different jurors, I'm not prepared to do that, although I am certainly mindful of the . . . need we may have to ask jurors if they were influenced by that." The court dismissed the five jurors. Defense counsel made a request that he "be allowed to renew the motion at a later time if it becomes plain that we're having problems." The court responded, "We'll know if it's going to be significant based on the voir dire, but I certainly will give you that opportunity."

Before resuming voir dire, the court addressed the potential jurors at some length:

"[W]e could not let this moment pass without at least closing up on what we just experienced here as [the prosecutor] was making her remarks . . . .

" . . . I've been in this a long time. I've never had anything like that happen. . . . I've never had people get up out of the gallery during these brief statements and leave the courtroom because they were so upset.

"So, I think it does make an important point, that these charges, as I explained to all of you, are the sorts of things that can engender a lot of emotion and reaction by jurors. I know that.

"I've tried dozens of child molest[ation] cases. I couldn't count the number that I've tried and I know that people can react that way to the mere mention of these charges. It's . . . inconceivable that we have stuff like this going on and in our minds in the idea that children can be victims, and, so, hearing charges of this sort and the number that were read and the allegations that were read, I completely understand, can create . . . an emotional reaction.

4

"And what we saw there was apparently a storm of reaction among at least five members of the jury, and there may be more of you out there who did not act on an urge or an instinct to get up and leave the courtroom because of the remarks I made trying to impress on you and remind you all that we have a presumption of innocence in our country, that we don't let accusation alone suffice for proof, that we don't let charges stand as evidence . . . . [The prosecutor] hadn't even made her complete remarks, and several people were so overcome with emotion that they could not sit and listen to the rest of her explanation or give the defense the opportunity to make . . . remarks . . . .

"So I know there may be some of you out there who are struggling against that urge . . . , and if you are feeling that way, I understand and we need to know about that. We certainly don't want people on this jury who . . . have so been overcome with emotion that they cannot give a reasoned, thoughtful, . . . impartial view of the evidence. We . . . just don't want you on the jury for our own interests to say nothing of not wanting to put you in that position.

"But it's also been my experience over time that people who come to court and are surprised and shocked at times at the charges that I read to them, once they kind of regain their equilibrium and they have in mind the presumption of innocence and they realize that whatever verdict is appropriate at the end of the case, they'll be given every opportunity to enter, they are more able to see the bigger picture and get their feet under them a little bit and go on with the process, but that's not true in every case and I'm prepared for the fact that it may not be true in your case.

"Ma'am, I'll get to you in a minute, but I want to make sure everyone understands that there's a requirement that if you serve here, you've got to be able to extend the presumption of innocence to [defendant], and if you can't do that, I need to know that, because we'll have to find others who can.

5

"Is there anyone on the jury now, who just from what you've seen or heard, feels that you could not extend the presumption of innocence to [defendant] during this trial? If not, let me see your hand."

One juror indicated a pro-defense bias as the result of her brother "who was in a similar case as this" in which the witness recanted, at a cost to the brother of $40,000. On further voir dire from the court, she agreed that she could decide the present case on the evidence without a bias for or against either side. The court then asked the panel for a show of hands if anyone could not be fair and impartial, or could not apply the presumption of innocence. No one raised a hand. Defense counsel did not at any later point renew the issue of dismissing the panel.

### B. Analysis

A ruling on a request to dismiss a panel is reviewed for an abuse of discretion. (*People v. Nguyen* (1994) 23 Cal.App.4th 32, 41.) "[D]ischarging the entire [panel] is a remedy that should be reserved for the most serious occasions of demonstrated bias or prejudice, *where interrogation and removal of the offending* [*prospective jurors*] *would be insufficient protection for the defendant*." (*People v. Medina* (1990) 51 Cal.3d 870, 889, italics added [remedy not warranted merely because "a few" prospective jurors made remarks indicating belief in defendant's guilt].)

After relating the above events (with a heavy reliance on melodramatic adverbs), defendant asserts the walkout of the five prospective jurors was inherently likely to have influenced the remaining prospective jurors, including the ones eventually seated on the jury, and therefore his right to a fair and impartial jury was violated. He analogizes to *People v. Nesler* (1997) 16 Cal.4th 561, in which *seated jurors* learned of prejudicial extrajudicial information about the defendant (an inapposite context), cites decisions from other jurisdictions finding irremediable taint from comments during voir dire, and cites other decisions that disparage the effectiveness of admonitions (including a decision

6

of the late Justice Jefferson declaring the presumption that jurors heed admonitions in the context of other crimes evidence is "an exercise in futility and illusory imagery" (*People v. Gibson* (1976) 56 Cal.App.3d 119, 130)).

In the first place, we must review the present trial court's ruling in light of the specific facts in the record before the court, and it is generally unproductive to compare different cases on a question of fact such as this. (Cf. *People v. Rundle* (2008) 43 Cal.4th 76, 137-138 [issue of sufficiency of evidence; describing task of comparing cases as having "little value"]; *Robison v. City of Manteca* (2000) 78 Cal.App.4th 452, 458, fn. 5 [issue of undue influence]; *State Compensation Ins. Fund v. Brown* (1995) 32 Cal.App.4th 188, 202 [issue of status as independent contractor].) We thus eschew the task of digesting and distinguishing the results in other cases assessing taint in the jury selection process.

As for defendant's suggestion that the trial court's efforts were unavailing, the reliance on admonitory remarks generally is a pragmatic presumption essential to the system of trial by jury, without which we court judicial anarchy because there would never be any point in instructing a jury (or reversing for improper instructions). The presumption is overcome only in *extraordinary* situations where it would fly in the face of human nature, such as where an involuntary confession or the inculpatory extrajudicial statements of a codefendant are involved. (*Richardson v. Marsh* (1987) 481 U.S. 200, 211 [95 L.Ed.2d 176, 188]; *Francis v. Franklin* (1985) 471 U.S. 307, 324, fn. 9 [85 L.Ed.2d 344, 359]; *Parker v. Randolph* (1979) 442 U.S. 62, 74-75 & fn. 7 [60 L.Ed.2d 713, 724-725] (plur. opn. of Rehnquist, J.); *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 292; *People v. Anderson* (1987) 43 Cal.3d 1104, 1120-1121.) In light of this uniform body of controlling authority, we reject defendant's urgings to find the trial court's extensive remarks to the panel ineffective.

The conduct at issue here does not involve any suggestion of defendant's guilt. Rather, it simply expressed the heightened sensitivity of the prospective jurors toward the

7

*type* of charges at issue. The trial court extensively reminded the panel of the obligations to be impartial until deliberations, and to apply the presumption of innocence, and investigated whether anyone would be unable to comply with these obligations. The court and parties thereafter had the opportunity during individual voir dire to investigate further whether anyone's ability to remain impartial was impaired, and defense counsel never indicated any lingering dissatisfaction with the process. Under these circumstances, the trial court did not abuse its discretion in declining to dismiss the panel.

## II. Financial Issues

In the information included with the jury's instructions, six of the offenses were alleged to have occurred between November 2001 and November 2002, and one between November 2003 and November 2004. At the time of defendant's offenses, the sex offender fine was only $200. (Pen. Code, § 290.3, as amended by Stats. 1995, ch. 91, § 121, p. 346.) As defendant's acts antedate the increase in the fine to $300 in 2006 (Stats. 2006, ch. 337, § 18, p. 2610), the prohibition against applying punitive fines ex post facto precludes applying the increase to defendant. (*People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1248.) We will reduce the fine to $200.

Similarly, the DNA penalty assessment was also enacted in 2006. (Gov. Code, § 76104.7, added by Stats. 2006, ch. 69, § 18, pp. 1251-1252.) We determined this was a punitive fine that could not be applied ex post facto. (*People v. Batman* (2008) 159 Cal.App.4th 587, 591.) We must therefore strike the penalty assessment.

Defendant recalculated the total of the sex offender fine with its associated assessments as $600 rather than $1,140. The People do not take issue with defendant's math, and we modify the judgment accordingly.

An administrative fee of 10 percent applies to the collection of restitution from prisoners. (Pen. Code, § 2085.5, subd. (e).) An administrative fee of 15 percent applies

8

*only* to the collection of restitution from *probationers*.  (Pen. Code, § 1203.1, subd. (*l*).) We will modify the judgment to apply the correct percentage.

## DISPOSITION

The judgment is modified to reduce the sex offender fine to $200, strike the DNA penalty assessment, and reduce the other associated assessments to a total of $400; and to reduce the administrative fee to 10 percent.  As modified, the judgment is affirmed.  The trial court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

           BUTZ        , J.

We concur:

      RAYE        , P. J.

      HOCH        , J.