477 So.2d 572 (1985)
Kerry Dean HALL, Appellant,
v.
STATE of Florida, Appellee.
No. 84-1742.
District Court of Appeal of Florida, Fourth District.
July 3, 1985.
Richard L. Jorandby, Public Defender, and Tatjana Ostapoff, Asst. Public Defender, West Palm Beach, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Georgiana Jimenez-Orosa, Asst. Atty. Gen., West Palm Beach, for appellee.
GLICKSTEIN, Judge.
Defendant/appellant was indicted on two counts: first degree murder and robbery with a deadly weapon. Upon trial the jury found him guilty on both counts. The trial court likewise adjudicated him and, following the jury's recommendation, sentenced him on the murder count to a life term with a twenty-five year mandatory minimum, and a concurrent life term on the robbery with a deadly weapon count. Hall's motion for a new trial was unsuccessful. We reverse his convictions and sentences but certify a question of great public importance which arises out of the relevant issues.
*573 The facts show that appellant and his friend, Jason Deaton were male prostitutes. They lived at a Fort Lauderdale motel along with three runaway fourteen and fifteen-year-old girls, whom they had met at the beach.
Santi Campanella, a Rhode Island businessman, arrived in Fort Lauderdale on business on May 26, 1983. He stayed on the company yacht and at the Pier 66 Hotel and drove a leased 1982 Chrysler New Yorker bearing Florida registration tag DMC 175. Hall met Campanella on May 27. On or about the same day, Hall and Deaton discussed leaving Fort Lauderdale, for which they needed a car and money. The girls wanted to leave Fort Lauderdale because the police were harassing them. Hall said he knew a rich guy who had a car. A plan was made for Hall and Deaton to meet Campanella and kill him in order to take his car and his money. Hall would arrange to meet Campanella and ask him to take Deaton along and drop him at Sears Town for a trick. Deaton would use an electrical lamp cord to strangle him. This was discussed in the presence of two of the girls. The next day the plan was rediscussed in the presence of all three girls. Deaton would ride behind Campanella and would strangle him to death with the lamp cord after they arrived at Sears Town. Two of the girls saw Hall, Deaton and Campanella drive away from their motel. Deaton was in the back seat behind Campanella, who was driving.
Campanella's business associates last saw him the afternoon of May 28, 1983. Two days later he was reported to the police as missing.
Later in the evening of May 28, 1983, Hall and Deaton returned to the motel in Campanella's car. The girls testified there was blood in various places inside the car and on Hall and Deaton. The defendant/appellant Hall and Deaton wiped up the blood and the five drove off in Campanella's car to Tennessee. Hall had family there and knew a place to dispose of Campanella's body, which was in the trunk.
During the drive Hall and Deaton described the killing to the three girls. Deaton said when the three men arrived at the Sears Town parking lot, Deaton, sitting behind Campanella, put the electrical cord around Campanella's neck and pulled it tight, and made Campanella move to the front passenger's seat, while Hall went around to the driver's seat. Hall held the cord while Deaton moved to the other side of the car. Campanella begged for his life. Campanella moaned and groaned as Deaton tightened the cord. Hall and Deaton beat on his chest, face and throat and blood started gushing from Campanella's mouth. Deaton and Hall laughed and joked as Deaton told the story. After Campanella died, the pair threw his body into the trunk. Hall told the girls they took $80, an American Express card and a watch from Campanella. Deaton was wearing the watch. Hall had the money and the credit card. He used the credit card during the trip.
When the group arrived in the Knoxville area they stopped at Hall's grandmother's house, then drove on to two shallow wells Hall knew about. The body with the electrical cord around its neck was dumped in the second well. They then drove to a river or lake where the two men washed blood from their arms and wiped out blood from the trunk with a pair of Deaton's shorts. Criminal investigator Sirmans testified he found a floor mat, a Chrysler lug wrench and a pair of bloody swimming trunks there. The blood type matched that of Campanella.
The three runaway girls all testified as to the repeated use by Hall of the victim's American Express card to purchase items for himself and all of the grisly group after dumping Campanella's body in the well. One of the girls even testified that Hall practiced the victim's signature while in the vehicle.
On May 30, 1983, the group attempted to buy clothes at a woman's clothing store at a Tennessee shopping mall. A salesperson described the five. Hall tried to use the American Express card. The clerk asked for identification, and Hall said he left his *574 driver's license in the car and would go get it. The group left the credit card in the store's possession and drove on to Arkansas. The three girls were picked up for trespassing and loitering at an Arkansas truck stop and were sent home. Hall and Deaton drove off when the girls were arrested. All three girls positively identified Hall as the person who planned Campanella's killing with Deaton. They testified Hall knew Campanella and called him to meet them so that Deaton could kill him and they could steal his car and leave Florida. All said they did not get in touch with the authorities when they learned of the killing out of fear of Hall and Deaton, and because they didn't think they would be believed.
On June 8, 1983, Hall and Deaton went to an Oak Ridge shopping center and sold a camera at a camera store for $100. Police had received a report concerning a suspicious vehicle in the parking lot. Officer Duckett was dispatched there to investigate. He and other officers observed the maroon Chrysler New Yorker with the Florida registration tag DMC 175. Deaton was seen in the vehicle. When Hall returned to the car with the $100 and began to drive away the police stopped the car and ordered the occupants out of the car. The two identified themselves respectively as Jason Deaton and Jeffrey Lyn Spradlin. The latter subsequently was identified as Kerry Dean Hall. Camera store personnel later identified Hall as the person they had done business with from a photo array.
Hall and Deaton were given their Miranda rights as soon as they were out of the car, and were taken to the Oak Ridge police station. Duckett again gave Hall his Miranda rights before he and Officer Fount interviewed Hall at the police station. Hall indicated he understood his rights, and signed a rights form "Jeff Spradlin." Hall claimed he knew nothing about the source of the car or of Santi Campanella. He claimed Deaton picked him up in the car in Fort Lauderdale to drive him to a job in Texas.
Duckett called the Fort Lauderdale police department and informed Detective Rice the Oak Ridge police had the car rented by Campanella and had two suspects in custody. The missing car had been noticed to police around the country by computer network. Officer Duckett had grasped from his conversation that Spradlin knew the area well, and after learning from Detective Rice about the persons suspected of the crime contacted the Loudon County sheriff's department for a description of Kerry Dean Hall. Officer Jessen went over to the Oak Ridge jail and personally identified Spradlin as Kerry Dean Hall.
Fort Lauderdale officers Rice and Patterson flew to Knoxville and were taken to the Oak Ridge police station by Officer Duckett. With Duckett and Foust the two Fort Lauderdale officers briefly met with the suspects. Rice and Patterson introduced themselves, told the suspects why they had come from Fort Lauderdale and said they would be back to talk with them the next morning, June 9, 1983.
Rice and Patterson talked with hall for two or three hours the next morning. Hall said he had never been in Florida, whereas Rice knew Hall had been arrested in Stuart. Hall also denied using Campanella's credit card.
Rice then talked with Deaton, again first giving him his Miranda rights. From this talk Rice returned to where Hall was being held and told Sergeant Patterson there was no need to worry about Hall because as a result of talking with Deaton he knew that Campanella's body was in a well in the mountains near Hall's grandmother's house. This startled Hall, who said Deaton would never find it and that he, Hall, would take the police there. Hall said he never thought Deaton would snitch on him. The officers then took a taped statement from Deaton, after which they went with Hall to the well where Campanella's body was. The body was floating on the water. The body was removed from the well. The electrical cord was tied tightly around Campanella's neck.
*575 Upon returning to the Oak Ridge police station, Rice gave Hall his rights again and took a statement from him. The taped statement was played at trial. Hall said Deaton knew the trick whom Deaton wished to scare, and Hall went along only because Hall was high. He did not know the man was dead when the body was put in the trunk. Deaton threatened to turn Hall in, if Hall left, and that is why Hall agreed to show Deaton where to hide the body. The two men and the three girls with whom they had been living then drove to Tennessee. Hall denied taking active part in the killing, claimed he wouldn't kill anybody, and said he wouldn't have gone with Deaton to roll the trick if Hall had not been high.
Over Hall's objections for discovery violations, the state introduced the testimony of Officer Robert Foley as a handwriting expert. Appellant argues here that the trial court erroneously allowed Foley to testify (1) the signature on the credit card form at the women's store, and on the Spradlin and Hall rights forms and fingerprint card were written by the same person, and (2) the signature on the Spradlin driver's license Hall used when arrested was written by someone else.
The substantial issues, in our view, are (1) whether there was a discovery violation which the trial court improperly failed to recognize and thereby failed to take the required action upon such violations being called to its attention; and (2) whether the nature of the discovery violation was such that the trial court's failure to take clearly recognized steps in such instance entitled the defendant to a new trial.
We first conclude that the testimony of Officer Foley as to the credit card was not a discovery violation. The record establishes that Officer Foley's name was on the witness list as early as April 18, 1984. A report on his comparison of various writings to the handwriting of Jason Deaton was submitted to Hall's counsel on April 25. That report did not refer to Kerry Dean Hall, and Foley was not specifically listed as an expert as to Hall, nor was his report as to Hall furnished to Hall's counsel prior to Foley's testimony. Moreover, Hall's counsel never deposed Foley because it seemed Foley's testimony would concern only Deaton.[1] However, about a week before jury selection, the assistant state attorney told Hall's counsel of Foley's finding that Hall had signed the charges made on the victim's American Express card.
We next conclude that the failure of the assistant state attorney to notify Hall's counsel that Hall's signature was not on the Spradlin driver's license was a technical discovery violation, albeit about a matter we perceive as tangential, unnecessary to the prosecution, and meaningless to any issue involved or to any defense that could be proposed.
There is no question that the trial court erred in not conducting an inquiry as to the surprise to Hall's counsel arising out of Foley's unexpected testimony respecting the Spradlin driver's license, once Hall's counsel objected on the ground of a discovery violation. Although we conclude the error was harmless beyond a reasonable doubt, we feel compelled to reverse because this court has consistently acted under the belief that the failure to conduct an inquiry as required by Richardson v. State, 246 So.2d 771 (Fla. 1971), compels a per se reversal. In Carroll v. State, 414 So.2d 247 (Fla. 4th DCA 1982), this court said "failure to conduct such inquiry constituted per se reversible error." Id. at 249.
In refining Richardson, the Supreme Court of Florida held that error committed under the rule can never be harmless. Cumbie v. State, 345 So.2d 1061 (Fla. 1977). In Cumbie, the prosecution had responded to the request for discovery by saying that the defendant had made no statement when in fact he had. At trial, two officers were allowed to testify as to the statement. The court said:

*576 No appellate court can be certain that errors of this type are harmless.
Id. at 1062. See also, Cooper v. State, 377 So.2d 1153, 1155 (Fla. 1979), which said:
Failure to disclose discoverable material is reversible as a matter of law absent a Richardson inquiry. [Citations omitted.]
In Brey v. State, 382 So.2d 395 (Fla. 4th DCA 1980), this court similarly relied upon Cumbie, saying:
Hence, the Supreme Court had in effect held that the harmless error rule cannot be applied to Richardson errors and that such errors are reversible as a matter of law.
Id. at 399. See also, Donahue v. State, 464 So.2d 609 (Fla. 4th DCA 1985), as well as Justice Alderman's concurring opinion in Cuciak v. State, 410 So.2d 916 (Fla. 1982).
In Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), the court said:
[b]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.
We do so in this case, and certify the following question to the Supreme Court of Florida as one of great public importance:
IS A NEW TRIAL REQUIRED WHEN THE TRIAL COURT'S FAILURE TO CONDUCT A RICHARDSON INQUIRY IS, IN THE OPINION OF THE REVIEWING COURT, HARMLESS ERROR BEYOND A REASONABLE DOUBT?
This was a grisly inhuman murder for which the defendant was not only fairly but thoroughly tried. Forgetting the logistical problem of bringing back three runaway youths from around the country to testify in another trial  one has to wonder what real opportunity the state would have to locate them in order to bring them back, particularly as there was no defense of any nature raised at trial  we are greatly troubled that a per se reversal rule must be applied in this case when the original trial has not only been fair but also within a thin reed of being perfect. However, only our state's highest court has the authority to change the per se rule which it created. We urge it to do so, while at the same time urging all trial judges assigned to the criminal division to recognize that the per se rule exists.
DOWNEY and DELL, JJ., concur.
NOTES
[1] Foley testified at Deaton's trial, which took place weeks prior to Hall's.