479 So.2d 208 (1985)
Darrell WHITFIELD, Appellant,
v.
STATE of Florida, Appellee.
No. 84-2044.
District Court of Appeal of Florida, Fourth District.
November 27, 1985.
Rehearing Denied December 26, 1985.
*210 Michael D. Gelety, Fort Lauderdale, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Georgina Jimenez-Orosa, Asst. Atty. Gen., West Palm Beach, for appellee.
GLICKSTEIN, Judge.
The defendant timely appeals his judgment and sentence. We affirm the former, but reverse the latter and remand for (a) preparation and execution of the sentencing guidelines scoresheet and (b) providing of written reasons, should the trial court decide to depart from the guidelines. State v. Jackson, 478 So.2d 1054 (Fla. 1985); Boynton v. State, 473 So.2d 703 (Fla. 4th DCA 1985), affirmed, 478 So.2d 351 (Fla. 1985).
Appellant, Darrell Whitfield, was arrested by the Fort Lauderdale police and charged by information with one count of armed robbery with a firearm, two counts of attempted robbery with a firearm, and three counts of aggravated assault with a firearm. His motions to suppress evidence based upon an improper arrest, to suppress statements, and to sever appellant's trial from his codefendant's were denied.
Whitfield was tried before a jury, put on no defense, and was found guilty of all six charges found in the information. At sentencing, the trial court granted the state's motion to aggravate the sentence outside the guidelines, and sentenced appellant to life imprisonment, with a minimum mandatory term of three years, on count I; thirty years, concurrently, on counts II and III, and five years, concurrently, on each of the three remaining counts.
The evening of March 23, 1984, at about 7:30 p.m., John McHugh and his wife, Debra McHugh, drove to downtown Fort Lauderdale to go to Sterling's Men's Store. After parking the car they walked to the store. On the way they were approached by two black men one of whom held a gun. The man with the gun told them it was a holdup and said he wanted McHugh's wallet. McHugh reached for his wallet and had trouble getting it because it was buttoned in McHugh's pants pocket. The gun was shaking close to McHugh, and he was afraid of being shot, because the wallet was empty. McHugh reached for the gun, and his thumb lodged between the hammer and the gun. There was a struggle and the two men fell to the ground. McHugh's adversary hit McHugh on the back of the head. The man with the gun was identified in court by McHugh as appellant.
During the scuffle, McHugh could hear his wife screaming, but could not see what Brownlee was doing. After being hit on the head, McHugh lay on the ground for a few seconds until he heard some gunshots. McHugh heard his wife screaming and saw his wife lying on the concrete four or five feet away.
Lawrence Hamilton was a security guard for Sterling's Men's Store. He observed the gunman knock Debra McHugh to the ground. When Hamilton approached and asked what was going on, Whitfield pointed the gun at Hamilton, yelled obscenities at him, and threatened to blow him away. Hamilton both saw and heard appellant fire the shots. Hamilton identified appellant at a show-up.
Samuel DeNoms was driving past the crime scene when he heard a woman's loud scream. He looked around and saw some people near the entrance to Sterling's, some with their hands up, and an individual "holding them at bay." DeNoms stopped *211 and saw a black individual who was holding something, wearing a fatigue jacket and light-colored pants, running from the crowd. The man ran across the street right in front of DeNoms, and between the buildings. DeNoms decided to try to follow but lost him. He parked and looked around, and saw the person across the railroad tracks with a bicycle and still carrying something. DeNoms began to follow. He saw a brief conversation between the first man and a second one. The first man passed less than 25 yards from DeNoms. DeNoms walked slowly behind the first man when something came from behind and knocked DeNoms to the ground. DeNoms was kicked in the back of the head. His assailant yelled threatening obscenities at DeNoms and pulled a gun on him. DeNoms, lying on the ground, covered his face with his arms. The gun went off. The man was trying to get DeNoms' wallet out of his pocket. DeNoms figured the gun was a cap gun, so he kicked his assailant  Whitfield  and knocked him off balance. DeNoms ran for his car. Whitfield yelled for him to stop and fired again. The bullet hit a puddle about a foot from DeNoms. DeNoms was about to drive away when a police car arrived. DeNoms told the police where Whitfield was. DeNoms forced Whitfield out of some bushes half a block away, and the police arrested him. DeNoms picked Whitfield out of a six or seven man show-up.
Officer Ben Langley of the Fort Lauderdale Police Department was the officer who met DeNoms in his small blue foreign car. DeNoms signaled the police to follow him. They stopped at a certain location and DeNoms said, "there they are." Whitfield and another black man jumped up from behind a hedge. Whitfield ran south, the other man west. Whitfield had a pistol in his right hand. Langley chased him among various buildings, stored boats and old cars. When he lost sight of Whitfield, Langley stopped and took up a position behind a garage. Whitfield appeared and started walking toward Langley. Langley jumped out from behind the garage with the police shotgun and told him to freeze, which he did. Langley then arrested Whitfield. Nearby Langley found, among articles of Whitfield's clothing, the revolver.
The issues are as follows, all of which we answer in the negative, except the last:
I. Whether the trial court erred, invading the province of the trier of fact, when, at the end of voir dire by appellant's counsel on appellant's tape recorded confession, the court stated its finding the statement was freely and voluntarily made.
II. Whether the following acts or omissions of the state prejudiced the appellant:
a. Failure to disclose that a victim/witness made a mistake in his identification at the hearing on the motion to suppress, after the witness so informed the prosecutor;
b. Failure to disclose that another victim/witness told the prosecutor he could not identify the clothing shown him as that worn by appellant;
And whether the court erred in denying motions to dismiss and motions for Richardson hearings in connection with these two purported discovery violations;
c. Appeal to the prejudice or sympathy of the jury in closing argument;
d. Prosecutor's comment that the evidence was uncontradicted, which is tantamount to a comment on the defendant's failure to testify;
e. Cumulative effect of the above prosecutorial errors.
III. Whether the trial court erred in preventing appellant from questioning the officer, who took the codefendant's statement, regarding the codefendant's status as a probationer, and from playing for the jury the edited portions of the codefendant's statement, which concerned his probation and which had been cut out over appellant's objection.
IV. Whether the trial court erred in failing to sever appellant's trial from that of the codefendant (and in admitting into evidence the codefendant's inculpatory statement).
*212 V. Whether the sentence outside the sentencing guidelines and at the maximum statutory levels, without written reasons for departure from the guidelines, and without setting forth clear and convincing reasons for doing so, is error, requiring resentence.

I
A pretrial evidentiary hearing had been held on appellant's motion to suppress confessions and statements. The court ruled appellant's confession had been freely and voluntarily made, and denied the motion.
In laying a foundation for offering Whitfield's tape-recorded statement in evidence, the State offered the testimony of Detective Richard Hayward, Fort Lauderdale Police Department. When the prosecutor asked Detective Hayward whether the statement was freely and voluntarily given, appellant's trial counsel objected, claiming this was an invasion of the jury's province. The court sustained the objection. Later, the state tendered the recorded statement as a state exhibit, subject to voir dire by Whitfield's attorney. At the end of this voir dire questioning, the trial judge said:
THE COURT: Will be received and filed as State's 12 in evidence. Subject to whatever existing objections there are, we will find that it was freely and voluntarily made.
After two more questions and answers in the direct examination of the officer by the state attorney, appellant's attorney approached the bench to ask whether he had correctly heard the court say the statement was found to be freely and voluntarily made. The court said this had been done for the purpose of admissibility only. Whitfield's counsel contended this was improper and said he would move for a mistrial, because he had not had an opportunity to voir dire in the presence of the jury on the freeness and voluntariness of the confession. The court offered counsel the opportunity to do so then, and denied the mistrial motion.
Later in the proceedings, when Whitfield's codefendant's statement was being offered into evidence, the state asked the officer whether the codefendant had answered the questions voluntarily. The court sustained an objection to this question, instructed the jury to disregard the question, and explained to the jury that "ultimately it will be your decision as to whether or not this statement or either or both of them were freely and voluntarily given. That is a jury question. In instructing the jury at the close of all testimony, the court said:
A statement claimed to have been made by the defendant outside of court has been placed before you. Such a statement should always be considered with caution and be weighed with great care to make certain that it was freely and voluntarily made. Therefore, you must determine from the evidence that the defendant's alleged statement was knowingly, voluntarily and freely made.
In making this determination you should consider the following circumstances including but not limited to:
1. Whether when the defendant made the statement he had been threatened in order to get him to make it; and,
2. Whether anyone had promised him anything in order to get him to make it.
If you conclude the defendant's out of court statement was not freely and voluntarily made, you should disregard it.
Appellant argues the comment or ruling made by the judge within the hearing of the jury, that Whitfield's statement was freely and voluntarily made, constitutes reversible error. Appellant argues that the jury, having heard the judge say Whitfield's statement was given freely and voluntarily, would not thereafter make an independent judgment as to the same question.
There is much case law bearing on this issue, but no case that is on all fours, in its relevant facts, with the present case. It is true that the trial judge is the dominant figure at a trial, and his comment tending to show his view as to the weight of the evidence, the credibility of a witness *213 or the guilt of the accused destroys the required impartiality of the trial. Gordon v. State, 449 So.2d 1302, 1304 (Fla. 4th DCA 1984) (quoting Hamilton v. State, 109 So.2d 422, 424 (Fla. 3d DCA 1959)). The trial judge's comment here may be seen as reflecting on the weight and credibility to be given Whitfield's confession.
In Gordon, the trial judge's negative comment was intended to be about a leading question by the appellant/criminal defendant's counsel, but may have come across as a comment on the testimony and veracity of the appellant. Nevertheless, it was only the combination of this comment with an erroneous reference by the court, while reading the jury instructions, to the appellant's plea of guilty (when he had pleaded innocent), that impelled the majority in Gordon to find reversible error; the comment alone was not sufficient to support such a finding. The dissenting judge in Gordon saw no error at all in the judge's comment, and thought the misreading of the jury instruction was harmless. We think Gordon demonstrates how hard it is to say whether a judge's comment is error at all, let alone reversible error.
We know from the cases that the determination of the voluntariness of a confession is a mixed question of fact and law, to be initially determined by the court when it decides whether the confession is admissible, and ultimately determined by the jury. E.g., Donovan v. State, 417 So.2d 674, 676 (Fla. 1982); State v. Oyarzo, 274 So.2d 519, 521 (Fla. 1973); Smith v. State, 135 Fla. 835, 838, 186 So. 203, 206 (1939).
Although the following excerpt comes from an old opinion it appears to be viable and is one of the clearest versions we have been able to find of the pertinent rule in Florida:
Before admissions made by a party under arrest can be introduced in evidence the court should determine the important question of whether they were free and voluntary, and the court must make this determination before permitting the admission to go to the jury. This question is for the court and is not a matter of opinion of witnesses. This investigation should be made in the absence of the jury. If it clearly appears that such admissions were voluntarily made, they are admissible, but the question of voluntariness should be more stringently examined when the party is in custody. Louette v. State, 152 Fla. 495, 12 So.2d 168.
Thomas v. State, 92 So.2d 621, 624 (Fla.), cert. denied, 354 U.S. 925, 77 S.Ct. 1389, 1 L.Ed.2d 1440 (1957).
One may infer from the statement in this excerpt that the investigation should be made in the absence of the jury, that the conclusion should not be stated to the jury, though such inference is not absolutely indicated. Here, it can be argued, however, as the state does, that the court's comment was induced by defense counsel. Moreover, if the comment was error, it could have been overcome by the two later statements to the jury referred to above. Finally, if the error survived the court's efforts at cure, it was harmless error; quite independently of Whitfield's statement, there was so much evidence that Whitfield perpetrated the crimes charged that a jury would surely have convicted him whether or not his confession had been admitted and whether or not the judge had commented on the circumstances of the confession as he did. See Palmes v. State, 397 So.2d 648, 653-654 (Fla. 1981).

II
Appellant's second issue, which we have restated to reflect what his argument contains, is more like five or six issues. Appellant points out five acts or omissions of the prosecutor which he feels severely prejudiced his trial; he also argues that the trial court's failure to grant his motions for dismissal and motions for Richardson hearings because of two alleged discovery violations constituted reversible error.
The two alleged discovery violations were the prosecutor's failure to tell the defense (1) that Mr. DeNoms had informed the prosecutor he had misidentified the appellant *214 at the suppression hearing and (2) that Mr. McHugh could not identify Whitfield's clothing.
The second of these can be readily dismissed as a violation, in our opinion. McHugh made clear he could identify Whitfield by his face, which he had seen up close during a physical encounter. That McHugh had not sufficiently noted Whitfield's garments to identify them later is hardly evidence known to the state that tends to show the defendant's innocence, as appellant seeks to assert. It is not as though, for example, the state failed to share with the defense the name of a witness who could provide Whitfield with an alibi. Other witnesses recognized Whitfield's clothing; there were several positive identifications of Whitfield as the perpetrator; appellant knew McHugh was a witness, and could have deposed him. We do not think McHugh's inability to identify the clothes Whitfield wore at the time of the crimes has any significance.
Next we turn our attention to DeNoms' voluntary communication to the prosecutor. As we understand the facts, at the suppression hearing Mr. DeNoms reversed the identities of Whitfield and Brownlee; that is, he said, in effect, Whitfield was the one who did what Brownlee did, and Brownlee did the things Whitfield did. Evidently changes in hair style and different appearances as to the relative heights of the defendants when seated confused him. He realized his mistake when he saw the two defendants, after the hearing, in upright positions, and sought out the prosecutor to tell him of his mistake. The record indicates the state attorney merely told DeNoms to tell the truth in future testimony in the case, and did not tell the court or the defense about DeNoms' volunteered error.
The suppression hearing occurred two days before DeNoms' testimony at trial. While the prosecutor was questioning him on his ability to identify Whitfield, what had transpired at the suppression hearing and DeNoms' subsequent communication with the prosecutor came out. Counsel for appellant approached the bench and moved for "a full hearing outside the presence of the jury," which the court denied. He also moved for dismissal and the court also denied that. The prosecutor then resumed questioning of Mr. DeNoms. His line of questioning concerned the content of DeNoms' communication to the prosecutor after the suppression hearing. Defense counsel objected to many of the questions as leading, and some of these objections were sustained. During the ensuing brief recess, Whitfield's counsel moved for a recess because of the change in DeNoms' testimony, of which he had not been informed. Defense counsel stated DeNoms had not been available for deposition and therefore what counsel heard from DeNoms at the suppression hearing was the first he knew of what DeNoms could be expected to say at trial. Counsel said he wanted to question the state attorney and his intern, who had been present when DeNoms told the prosecutor of his mistake in identification. The prosecutor angrily denied that DeNoms had been unavailable for deposition and said Whitfield's counsel had talked with DeNoms, but had never sought to depose him. The prosecutor said he had put no words in DeNoms' mouth, but had told him to decide whether what he had said was right or wrong, and to testify accordingly. The prosecutor denied there had been any violation. The judge denied the continuance request, and the trial proceeded with the cross-examination of DeNoms. The cross-examination brought out before the jury the facts that DeNoms had misidentified Whitfield "the other day," and had then talked with the state attorney and his intern about it.
What kind of violation requires a Richardson hearing, and, absent such a hearing and the appropriate outcome thereof, results in reversibility? Is this such a violation?
The opinion which first required what we now call a Richardson hearing, Richardson v. State, 246 So.2d 771 (Fla. 1971), concerned failure of the prosecution to supply to the defense the name of a witness, who subsequently was called to testify. The *215 opinion seemed to apply specifically only to a witness list violation. Over the years, however, case law has shown a Richardson hearing to be required whenever there has been a discovery violation. Although the Richardson opinion states that the trial court has the discretion to determine whether the discovery violation was prejudicial, it also says the court may make such a determination only after what we now call a Richardson inquiry has taken place. The purpose of such an inquiry is to examine whether the state's violation was inadvertent or willful, trivial or substantial, and what effect, if any, the violation had on the defense's ability properly to prepare for trial. Rule 3.220(f) imposes on the prosecutor the duty, subsequent to compliance with the above rules, to disclose or produce any additional witnesses or material that comes into the prosecutor's knowledge, possession or control, if the prosecutor would have been required to disclose or produce them initially had he then known of or had them.
The content of Rule 3.220 has probably been influenced by two federal Supreme Court cases. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), stands for the principle that prosecutorial nondisclosure of evidence favorable to the defendant who has requested such evidence results in a violation of due process, provided the suppressed evidence is material to the defendant's guilt or punishment. In United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court wrote that when the defense has made a pretrial request for specific evidence and the requested evidence is withheld, a new trial will be ordered if the evidence is material; that is, if the suppressed evidence might have affected the outcome of the trial.
We think Brady and Agurs are not directly implicated in the instant issue: first, we do not see clear evidence that there was a specific request for exculpatory evidence; secondly, even if there was we do not see how the prosecutor's knowledge here involved qualifies as exculpatory evidence.
Neither do we think there was a violation of the discovery rule requiring the holding of a Richardson hearing. The nature of the prosecutor's knowledge that was withheld from the defendant's attorney was that victim/witness DeNoms realized, after testifying at the suppression hearing, that he had mistakenly attributed to Whitfield the actions of Brownlee, and vice versa. We do not see how this information fits into any of the eleven categories found at rule 3.220(a)(2). It does not fit under rule 3.220(a)(2), because it does not tend to negate Whitfield's guilt. Quite the contrary; to the extent it matters which of two codefendants jointly participating in crimes performs particular criminal acts, DeNoms' realization of his mistake results in inculpation of Whitfield rather than his exculpation. Had the prosecutor come into such information as DeNoms' realization of his mistake at an earlier time, the prosecutor would not have been required to disclose it to Whitfield; rule 3.220(f) does not, therefore, require him to disclose it when he came into the information just before trial.
We do not think the discovery rule or Richardson and its progeny intend to protect defendants from all surprise. As the state has said, one can never predict with certainty what any witness  one's own or the adverse party's  will say. It may be the defense was banking on DeNoms to continue to confuse the two codefendants while testifying; however, one wonders how the defense would have benefited had this happened, as it would hardly be profitable to point out his mistake. But assuming the defense was indeed surprised to learn that DeNoms had realized he got Whitfield's and Brownlee's identities mixed up when testifying at the suppression hearing, and that their strategy was affected by the change in testimony at trial, we suggest that this surprise is not what our discovery rules are intended to protect against. Neither side is required to alert the opposing party to the content of a witness' testimony, except to the extent a written or recorded, oral statement of the *216 witness or an expert witness' report may foreshadow what he will say on the stand. Whitfield knew DeNoms was a witness the state intended to call; DeNoms had been available for deposition but had not been deposed. What DeNoms said to the prosecutor following the suppression hearing was not a written or recorded statement of DeNoms. We do not believe there was any discovery violation; hence there was no need for a Richardson hearing. The trial court correctly denied the motion for a hearing and the motion to dismiss because of a purported discovery violation.
The sub-issue we have labeled II(c) concerns something the prosecutor said during closing argument which appellant contends appealed to the prejudice or sympathy of the jury. Appellant claims that the prosecutor's remarks to the effect that the interest of the victims of the crimes for which appellant and his codefendant were on trial was an interest in justice were uninvited but were calculated unduly to influence the jury. The state points out that the codefendant's counsel was the first to suggest in closing argument that the McHughs and Mr. DeNoms were looking for someone to be punished for the injuries they had suffered; and that appellant's trial counsel had paraphrased those remarks, referring to the state's witnesses' interest in the result of the trial, and indicating the prosecutor would not disagree that the witnesses had an interest in the outcome because of being victims. The thrust of Whitfield's counsel's remarks was that these witnesses' testimony should be weighed with their vindictive interest in mind. The state contends it had to counter by imputing to the victims the same interest in justice as the state, to overcome the attack on the principal state witnesses' credibility.
We think the state's comment on the victim/witnesses' interest was neither prejudicial nor inflammatory. If it was, the defect was overcome by the court's advice to the jury, upon appellant's counsel's objection, to take the testimony and regard it for what it is, and not the lawyers' arguments, and his caution preceding closing argument, that counsel's argument was only that, and not evidence.
Taken in the context of the trial as a whole, as well as the closing arguments to which they were in response, we think the prosecutor's remarks here at issue were well within the bounds of permissible "fair reply," e.g., Ferguson v. State, 417 So.2d 639, 642 (Fla. 1982), and, given the overwhelming evidence against Whitfield, could have had no significant impact on the verdict. There was no error.
Next appellant points out that in closing argument the state attorney said:
The evidence, ladies and gentlemen, proves to you beyond a reasonable doubt that the defendants did, in fact, commit the charges alleged in the information, and you haven't heard one word of testimony to contradict what the victims in this case have said, other than what the lawyers' argument has been. And, ladies and gentlemen, what the lawyers say is not evidence.
Appellant objected and moved for a mistrial; the court denied the motion, and instructed the prosecutor to proceed. Interestingly, the first thing the state attorney then said was, "For the record, White vs. State." The reference is doubtless to White v. State, 377 So.2d 1149 (Fla. 1979), cert. denied, 449 U.S. 845, 101 S.Ct. 129, 66 L.Ed.2d 54 (1980). In that case, there had been a single eyewitness to the crime, other than the defendant who did not testify. In closing argument the prosecutor observed that, other than the argument of the defense lawyer, the jury had heard not one word of testimony that contradicted what the eyewitness had said. The defendant objected and moved for mistrial. The motion for mistrial was denied and the district court of appeal affirmed the denial. The Florida Supreme Court agreed, saying:
It is proper for a prosecutor in closing argument to refer to the evidence as it exists before the jury and to point out that there is an absence of evidence on a certain issue... . It is thus firmly imbedded in the jurisprudence of this state *217 that a prosecutor may comment on the uncontradicted or uncontroverted nature of the evidence... .
Id. at 1150 (citations omitted).
Recent Florida opinions affect the instant issue. The state, in its brief, refers to the federal test of a prosecutorial comment such as the present one: Was the remark manifestly intended as a comment on the defendant's failure to testify, or was it of such a character that the jury naturally and necessarily would take it as such a comment? In Kinchen v. State, 10 F.L.W. 446 (Fla. Aug. 30, 1985), our supreme court rejected this test in favor of the "fairly susceptible" test stated in David v. State, 369 So.2d 943 (Fla. 1979), because the latter test gives the defendant greater protection. We have no doubt, however, that the prosecutor's statement here under attack passes the fairly susceptible test quite as readily as it passes the federal test which the state prefers and offers in its brief. A comment which will not pass the test really has to be more like that in Kinchen, by the codefendant's counsel, that referred specifically to the defendant's out-of-court statement reported by a witness for the codefendant, and pointed out that statement had been unrefuted. Although the fairly susceptible test is more liberal to the accused than the federal test, the present comment passes it. We do not think the comment calls attention to the appellant's failure to testify.
Also of great significance is the recent case of State v. Marshall, 476 So.2d 150 (Fla. 1985). There the supreme court adopted the harmless error rule of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), in reference to comments on defendant's failure to testify. Thus, even if the comment were error, because fairly susceptible of interpretation as a reference to the defendant's failure to testify, if the state showed the error to be harmless beyond a reasonable doubt the conviction would still stand. Here the state has not attempted to show the error was harmless beyond a reasonable doubt, first, because it did not believe there was error with which we agree, and second, because it believed the harmless error rule remained inapplicable to an error implicating Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (reference to an accused's failure to testify).
Because none of the items to which issue II refers constituted error, then neither do they cumulatively require reversal.

III
Appellant sees error in the fact that a statement of the codefendant was edited, over appellant's objection, to eliminate references to the codefendant's being on probation. Appellant also contends it was error for the court to prevent him from questioning the officer who received the codefendant's statement about the fact the codefendant was on probation. Appellant argues that the fact of codefendant's being on probation would serve as a support for an argument that the codefendant invented the story about appellant. The state responds that it was entirely proper to stop the codefendant's taped statement at the end of the confession and not play before the jury the remainder of the tape, whose content was irrelevant. All that was cut out were two questions and two answers at the very end of the tape whose effect was to make known Brownlee was on probation. The state argues also that any connection between Brownlee's being on probation and a theory that Brownlee's admissions about Whitfield's conduct were a fabrication is wholly speculative. The state points out that the jury was explicitly instructed that Brownlee's confession was to be used solely against Brownlee and not against Whitfield. Hence there was no relevance to any attack by appellant on the codefendant's credibility. Brownlee was not a witness against Whitfield. On the other hand, since Brownlee did not intend to testify, he requested that there be no evidence about his probation, as the effect would be to call attention to his criminal history. Such history may be used to impeach, but not to show bad character or criminal propensity. E.g., McCrae v. State, 395 So.2d 1145 (Fla. 1980). Evidence reflecting *218 his criminal past could have been prejudicial to Brownlee, but would have brought no probative support to Whitfield's theory of innocence. Even relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice. § 90.403, Fla. Stat. (1983). See also, e.g., Williams v. State, 110 So.2d 654 (Fla. 1959).
Appellant argues that he should have been permitted to support his innocence by presenting proof of the codefendant's guilt. See, e.g., Lindsey v. State, 68 So. 932 (Fla. 1915). However, as the state points out, the same opinion goes on to say that merely showing someone could have committed the crime does not qualify as sufficient proof to lead a reasonable and just person to believe that the person was guilty. Such "evidence" need not be admitted. The trial court did not abuse its broad discretion in agreeing to omission of the last four transcribed lines of Brownlee's taped statement and refusing to allow Whitfield's counsel to probe regarding Brownlee's probation. Even if the trial court did err, this type of error is subject to the harmless constitutional error rule as stated in Garganus v. State, 451 So.2d 817 (Fla. 1984): the error was harmless beyond a reasonable doubt; or, there was no reasonable possibility the omission of the evidence being complained of contributed to the conviction. The present situation passes this test. There was overwhelming evidence of appellant's guilt, including his own confession.
Appellant also argues that the opinion in Chandler v. State, 366 So.2d 64 (Fla. 3d DCA 1978), supports his position on this issue. There is indeed a statement in Chandler that where evidence tends in any way, even indirectly, to prove a defendant's innocence, it is error to deny its admission. Chandler cites Watts v. State, 354 So.2d 145 (Fla. 2d DCA 1978), as the authority it paraphrases for this principle. However, Chandler also states that the trial court enjoys a certain discretion in deciding admissibility of evidence, and reconciles this principle with the other by saying the true test is relevance to the defense presented. It would be far-fetched to conclude that Brownlee's probation is relevant to Whitfield's apparent theory of defense that Brownlee really committed all the crimes and tried to pin the blame on Whitfield; and the theory itself is unreasonable.
Appellant tries to convey he is in the same position as the appellants in Watts v. State, 354 So.2d 145 (Fla. 2d DCA 1978), where it was held the evidence suppressed should have been admitted. There, however, the evidence suppressed was fingerprints lifted from a truck that figured in the kidnapping and robbery of which Watts and his codefendants were accused. The fingerprints were not those of any of the defendants. Surely such evidence figures circumstantially in the defense of the Watts defendants, who claimed they were not at the scene of the crimes; Brownlee's probation hardly figures at all in Whitfield's supposed theory of defense.

IV
Appellant's initial motion to sever was made before trial. The motion was denied after hearing. During trial, appellant several times renewed the motion to sever, and each time the motion was denied. Appellant particularly draws attention to the renewal of this motion in connection with the editing of the codefendant's confession and the court's prevention of examination of the officer on the subject of Brownlee's probation. The principal basis for seeking severance was the fact that Brownlee's inculpating statement would be admitted; yet that if Whitfield were being tried separately the Brownlee confession would be inadmissible.
Appellant calls attention to Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The state responds that the confessions of Whitfield and Brownlee are interlocking confessions, and that in such a case there is an exception to Bruton, carved out by the United States Supreme Court in Parker v. Randolph, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979). Bruton states in essence that in a joint trial, if the codefendant does not testify, introduction of his statement poses a threat to the other defendant's right to confront the witnesses against him, and a *219 limiting instruction cannot overcome the hazard. Parker states that in a joint trial, if the confessions of two codefendants interlock, in the sense that the salient facts against the first defendant that appear in the second defendant's confession also appear in the first defendant's confession, and vice versa, then both confessions are admissible against the defendants respectively who made them.
The Florida Third District Court of Appeal faced a similar issue in Damon v. State, 397 So.2d 1224 (Fla. 3d DCA 1981). There Damon and a codefendant each confessed to his or her own and the other's participation in a brutal murder. The two confessions in Damon were interlocking as that term is used in Parker. The appellate court held that the denial of severance in Damon was not error, whether on Justice Rehnquist's theory that the sixth amendment right to confront the witnesses against one was not implicated under these circumstances, or whether under a theory that the error is harmless, both of which theories appear in Parker. The Third District Court declined to choose between the two theories, on the basis that the difference seemed to it no more than semantic. Thus it appears that the critical question is whether the two codefendants' confessions are indeed interlocking. If they are, severance need not be granted merely because each defendant's codefendant's statement was going to be presented to the jury. We may point out that the theories referred to above seem to be based on the idea that when the codefendant's confession is purely cumulative to the defendant's own, what difference does it make that the jury has heard the codefendant's version of what happened; what is there to cross-examine the codefendant about, if the defendant's own confession has stood up, under scrutiny, as having been freely and voluntarily given?
Having examined the two statements as they appear in the record, we have concluded they are interlocking as we understand the meaning of that term as it is used in Parker. Brownlee's confession concerns basically the crimes only against the McHughs, as he was not actively engaged in the subsequent crimes with which the pair were charged. There are some factual differences between Whitfield and Brownlee's version of the events, but the discrepancies have no legal significance. Both men admitted they had the intention to make some money together by criminal means. The fact that Whitfield indicates they mutually came up with the criminal plan, whereas Brownlee says it was Whitfield's idea and Brownlee was merely to be a lookout, is not legally significant, because both are guilty of all the acts of either in perpetrating a common criminal scheme. The same may be said of the fact Whitfield said he did not see how Brownlee came by Mrs. McHugh's purse, whereas Brownlee says Whitfield took it from Mrs. McHugh and threw it to Brownlee. The confessions are interlocking as to salient facts, even though they differ as to facts that lack saliency.

V
There are two parts to appellant's last issue. First he contends that the court failed to set forth clear and convincing reasons for departing from the sentencing guidelines when sentencing appellant, on all counts, and failed to give written reasons for such departure. The state responds that when the court granted the state's motion to aggravate, the court adopted the reasons stated in the state's motion, and these reasons were clear and convincing. Secondly, appellant contends these should have been completed and filed or made part of the record guideline scoresheet.
As both appellant and appellee point out, at the time of this appeal the district courts of appeal of this state did not see eye to eye on the meaning of the rule 3.701(d)(11) requirement that a deviation from the sentencing guidelines be in writing and the rule 3.701(b)(6) requirement that departures from the guideline presumptive sentences be articulated in writing. In Harvey v. State, 450 So.2d 926 (Fla. 4th DCA 1984), we had said if proper reasons for departure are stated by the court orally for the record, when the record is transcribed for appeal, the rule requirement has been *220 met. In Boynton v. State, this court overruled Harvey and said that dictation into the record would not suffice, although a transcription of clear reasons dictated to a secretary or a court reporter, signed by the court, and attached to the scoresheet, would be acceptable. The reasons orally stated by the trial court in Boynton were not very clear from the record, and there was no scoresheet. Our opinion in Boynton was not consistent with Burke v. State, 456 So.2d 1245 (Fla. 5th DCA 1984), and more than one opinion of the Second District Court of Appeal, including Brady v. State, 457 So.2d 544 (Fla. 2d DCA 1984). The conflict has been resolved, however. In Jackson the Florida supreme court rejected the state's contention that a transcript of oral statements of the judge during sentencing was sufficient to justify departure from the guidelines, and adopted Judge Barkett's reasoning in Boynton for requiring a written statement delineating the reasons for the departure.
In the instant case, the trial court stated orally it was granting the state's motion to aggravate the sentence, and mentioned it thought Whitfield a menace to society who should be removed from society. The trial court failed to meet the requirement to state, in writing, clear and convincing reasons for the aggravation of Whitfield's sentences.
HERSEY, C.J., and HURLEY, J., concur.