509 So.2d 1093 (1987)
STATE of Florida, Petitioner,
v.
Kerry Dean HALL, Respondent.
No. 67319.
Supreme Court of Florida.
July 9, 1987.
*1094 Robert A. Butterworth, Atty. Gen. and Georgina Jimenez-Orosa, Asst. Atty. Gen., West Palm Beach, for petitioner.
Richard L. Jorandby, Public Defender and Tatjana Ostapoff, Asst. Public Defender, West Palm Beach, for respondent.
PER CURIAM.
The Fourth District Court of Appeal has certified the following question as one of great public importance:
IS A NEW TRIAL REQUIRED WHEN THE TRIAL COURT'S FAILURE TO CONDUCT A RICHARDSON INQUIRY IS, IN THE OPINION OF THE REVIEWING COURT, HARMLESS ERROR BEYOND A REASONABLE DOUBT?
Hall v. State, 477 So.2d 572, 576 (Fla. 4th DCA 1985). This Court has jurisdiction pursuant to article V, section 3(b)(4), Florida Constitution. We recently answered this question in the affirmative in Smith v. State, 500 So.2d 125 (Fla. 1986). Upon reviewing the record in this case, however, we believe that the trial court conducted an inquiry sufficient to satisfy the requirements set forth in Richardson v. State, 246 So.2d 771 (Fla. 1971). Accordingly, we answer the certified question in the affirmative, but quash the opinion of the district court.
The record shows that Hall and his friend, Jason Deaton, were male prostitutes who lived at a Fort Lauderdale motel with three runaway girls. Santi Campanella, a Rhode Island businessman, arrived in Fort Lauderdale on business on May 26, 1983. While in Fort Lauderdale, Campanella drove a leased 1982 Chrysler New Yorker bearing a Florida registration tag. On May 27, 1983, Campanella met Hall. On that same day, Hall and Deaton, in the presence of the three girls, discussed leaving Fort Lauderdale. Hall said that he knew a rich man who had a car, whereupon Hall and Deaton made plans to kill Campanella in order to steal his car and money. In the presence of all four of his cohorts, Deaton explained that he planned to strangle Campanella with the cord from a motel lamp. The plan first called for Hall to arrange to meet Campanella. Hall was then to ask Campanella to drive Deaton to Sears Town to meet a "trick." On the evening of May 28, 1983, Hall and Deaton once again discussed the scheme in the presence of all three girls. Deaton planned to sit behind Campanella and strangle him once they arrived at the Sears Town parking lot.
After discussing their plot, Hall and Deaton left the motel to meet Campanella. Two of the girls saw Hall, Deaton, and Campanella drive away from the motel with Deaton sitting behind Campanella. Later that evening, Hall and Deaton returned to the motel in Campanella's car. The girls testified that they noticed blood stains inside the car as well as on Hall and Deaton. After wiping up the blood, the five began driving in Campanella's car toward Tennessee where Hall had family and knew of a place to dispose of Campanella's body. They carried the corpse to Tennessee in the trunk of the Chrysler.
*1095 During the drive to Tennessee, Hall and Deaton graphically described to the girls how they murdered Campanella. Deaton told the girls that, upon arriving at the Sears parking lot, Deaton pulled the cord tightly around Campanella's neck and ordered him to move to the front passenger seat. Hall then moved to the driver's seat and held the cord while Deaton moved to the passenger side. The two men described how Campanella begged for his life as Deaton strangled him with the cord. As Campanella pled, Hall and Deaton beat his chest, face, and throat until blood began gushing from their victim's mouth. The girls testified that, as Deaton and Hall described the grisly scene, the two men laughed and joked about the murder, particularly about the victim's suffering.
Hall told the girls that they took $80, an American Express card, and a watch from Campanella. Deaton wore the watch as he laughed about the murder. Hall kept the cash and, after practicing the victim's signature, used the credit card repeatedly throughout the trip to Tennessee. Upon arriving in Knoxville, the group drove from Hall's grandmother's house to a shallow well where they dumped Campanella's battered corpse. They then drove to a lake where Hall and Deaton washed blood from their arms and wiped out the blood from the trunk of the car with a pair of Deaton's shorts. A criminal investigator later found a floor mat, a Chrysler lug tool, and a pair of bloody swimming trunks at the site. The blood type matched that of Campanella.
On May 30, 1983, the group attempted to buy clothes at a women's store in a Tennessee shopping mall. When Hall tried to pay for the clothes with the stolen American Express card, the sales clerk requested identification. Claiming he left his driver's license in the car, Hall and the rest of the group left the credit card with the clerk and drove to Arkansas. The clerk later described the five to the authorities. At an Arkansas truck stop, the police arrested the three girls for trespassing and loitering. Hall and Deaton fled the scene when the police picked up the girls.
On June 8, 1983, Hall and Deaton went to a camera store to sell a camera. The salesperson later identified Hall from a photo array. Meanwhile, a police officer, who had been dispatched to the shopping center upon a report that a suspicious vehicle had been seen in the parking lot, spotted the stolen Chrysler. The automobile still bore its Florida license tag. When Hall returned to the Chrysler and began to drive away, the police stopped the car and ordered Hall and Deaton out of the vehicle. At this time, Hall presented as identification a Florida driver's license bearing the name of Jeffrey Lyn Spradlin. The police booked Hall under that name until he was later identified as Kerry Dean Hall. After their arrest Deaton and Hall both made statements admitting to the murder, although Hall insisted that he had only taken a passive role in the killing. Hall also voluntarily led police to the well in which he and Deaton had dumped Campanella's body.
At trial the three girls testified extensively as to their knowledge of the murder, claiming they did not go to the authorities out of fear of Hall and Deaton and because they did not think the police would believe their story. The state also introduced the testimony of a handwriting expert, detective Robert Foley. Although defense counsel did not object to the detective being offered as an expert witness, the defense did object based on a discovery violation when Foley testified that he had examined thirteen documents to arrive at an expert opinion on Hall's handwriting. Although at the time of the objection the prosecutor brought up the possibility of holding a Richardson hearing, the trial court simply overruled the objection. During the testimony that followed, Foley stated, among other things, that the same person had signed four American Express receipts as well as the two rights forms and fingerprint cards already known to have been signed by Hall, one in his name and one in the name of Spradlin. Foley also testified that someone other than Hall had signed the Spradlin driver's license which Hall had used at the time of his arrest.
*1096 At the end of all the evidence, the state attorney once again suggested that the trial court conduct a short Richardson hearing. The discussion which took place during the hearing indicated that, although Foley's name had been included on the witness list supplied to the defense, a report received by the defense during discovery indicated that Foley intended to testify only as to certain comparisons of Deaton's handwriting. Defense counsel acknowledged, however, that approximately one week before trial the state had informed the defense that Foley had compared the signatures on Hall's rights waiver forms and on the American Express receipts, putting the defense on notice that Foley might testify as to this comparison. The state did not, however, at any time prior to trial, mention the driver's license or Foley's planned testimony that the signature on the license did not belong to Hall. Nevertheless, the trial court determined this discovery violation to be harmless, finding the "objection to be proform in nature, fairly perfunctory and for the record, no surprise and no prejudice."
On appeal to the fourth district, the court found that a technical discovery violation did occur when the state failed to inform the defense that Foley would testify concerning his analysis of the signature on the driver's license. Moreover, the court determined that the trial court's inquiry did not satisfy the requirements of Richardson. Therefore, the district court reversed Hall's conviction under the per se reversal rule of Richardson.
In 1971 this Court decided Richardson in order to effectuate the requirements of Florida Rule of Criminal Procedure 1.220, now rule 3.220. This rule requires, inter alia, that upon written request filed by the defense the prosecution must furnish a list of all witnesses whom the prosecuting attorney knows to have relevant information concerning the charged offense or any defense thereto.[*] The content of rule 3.220 was no doubt strongly influenced by the United States Supreme Court's decision in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Whitfield v. State, 479 So.2d 208, 215 (Fla. 4th DCA 1985). Brady involved a prosecutor's failure to inform the defense of a codefendant's extrajudicial confession. 373 U.S. at 84, 83 S.Ct. at 1195. Brady stands for the proposition that the nondisclosure of evidence favorable to the defense, when the defense has requested such information, results in a violation of due process when the suppressed evidence is material to the defendant's guilt or punishment. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985); Brady, 373 U.S. at 87, 83 S.Ct. at 1196; Whitfield, 479 So.2d at 215.
Richardson states that although the trial court has discretion in determining whether the state's noncompliance with the discovery rules resulted in harm or prejudice to the defendant, such discretion could be exercised only after the court made an adequate inquiry into all of the surrounding circumstances. At a minimum the scope of this inquiry should cover such questions as whether the state's violation was inadvertent or willful, whether the violation was trivial or substantial, and, most importantly, whether the violation affected the defendant's ability to prepare for trial. Cumbie v. State, 345 So.2d 1061, 1062 (Fla. 1977); Richardson, 246 So.2d at 775; Raffone v. State, 483 So.2d 761, 763 (Fla. 4th DCA), dismissed, 491 So.2d 281 (Fla. 1986); Whitfield, 479 So.2d at 215; Gant v. State, 477 So.2d 17, 19 (Fla. 3d DCA 1985); Donahue v. State, 464 So.2d 609, 611 (Fla. 4th DCA 1985). Based on Richardson, a trial court's failure to hold such an inquiry has been treated as per se reversible error. E.g., Smith, at 125-126; Zeigler v. State, 402 So.2d 365, 372 (Fla. 1981), cert. denied, 455 U.S. 1035, 102 S.Ct. 1739, 72 L.Ed.2d 153 (1982); Cooper v. State, 377 So.2d 1153, 1155 (Fla. 1979); Wilcox v. State, 367 So.2d 1020, 1023 (Fla. 1979); Cumbie, 345 So.2d at 1062; Hickey v. State, 484 So.2d 1271, 1273 (Fla. 5th DCA 1986); Raffone, 483 So.2d at 763; R.R. v. State, 476 So.2d 218, 218-19 (Fla. 3d DCA 1985), approved, *1097 502 So.2d 1244 (Fla. 1987); Lavigne v. State, 349 So.2d 178, 179 (Fla. 1st DCA 1977).
As we read the record, we disagree with the district court's conclusion that the trial court's inquiry into the alleged discovery violations failed to comply with the minimum requirements set forth in Richardson. As discussed in more detail above, the trial court inquired into the circumstances surrounding the alleged discovery violations and found that the only actual violation involved Foley's testimony concerning the signature on the Spradlin driver's license. As to that violation, the trial court made a sufficient inquiry during the course of the Richardson hearing to conclude that the violation neither surprised nor prejudiced the defense. When viewed as a whole, the record shows that the trial court made an adequate inquiry into the surrounding facts and circumstances of the alleged discovery violations to support its conclusions and satisfy the requirements of Richardson and its progeny.
Accordingly, we answer the certified question in the affirmative, quash the decision of the district court, and remand with instructions that the district court affirm the trial court's decision.
It is so ordered.
OVERTON, EHRLICH and BARKETT, JJ., and ADKINS, J. (Ret.), concur.
McDONALD, C.J., concurs in part and dissents in part with opinion with which SHAW, J., concurs.
McDONALD, Chief Judge, concurring in part, dissenting in part.
I concur with that portion of the majority opinion finding that the trial court conducted a sufficient inquiry into the surrounding facts and circumstances of the alleged discovery violation to satisfy the requirements of Richardson v. State, 246 So.2d 771 (Fla. 1971). I also agree that we should quash the decision of the district court. For the reasons expressed in my dissent in Smith v. State, 500 So.2d 125 (Fla. 1986), however, I dissent from the majority's affirmative answer to the certified question. I believe the per se rule of reversibility established in Richardson should be modified and the harmless error standard should be applied to a trial court's failure to hold a Richardson hearing.
SHAW, J., concurs.
NOTES
[*] Fla.R.Crim.P. 3.220(a)(1)(i).