GLICKSTEIN, Judge,
dissenting.
The critical point raised by the defendant is the first one in his brief; namely, the failure of the trial judge to conduct a Richardson hearing to determine if there was procedural prejudice, i.e., whether the state’s noncompliance with a discovery rule prejudiced the defendant’s ability to prepare properly for trial. See, e.g., State v. Hall, 509 So.2d 1093 (Fla.1987). No doubt, the basis for this court’s decision on that point will come as a surprise to the state and the defendant, as the state never raised it, nor did the defendant respond. One wonders if the form of the opinion will permit further review — another surprise.
Surprises for the defendant are not new. As a second grader, he was apparently sexually assaulted by his father. As an adult he alleges the murder took place during a surprise, serious homosexual advance by the victim. The defendant testified to this as well as his efforts to repulse the victim before striking him. Two psychologists testified that appellant suffered from post-traumatic stress disorder when the homicide took place.
Prior to bringing the jury into the courtroom, the trial court conducted a hearing on the defendant’s motion to suppress. The state was adamant in trying to prevent evidence that the victim’s blood, when tested after his death, showed that he was suffering from AIDS. The defendant was just as adamant in seeking to introduce it, as corroborative evidence of the victim’s homosexuality. There is no question in my mind that defense counsel prepared and went to trial in reliance upon the state’s representation that the blood tests were positive for AIDS. The trial court announced it would allow the evidence to come in.
*971 At trial, when defense counsel had the medical examiner on cross-examination, he asked about the blood tests. The state objected after the witness answered that he had tested the defendant’s blood. For the first time, the state included in its objection to the question one of “hearsay”, contending that the medical examiner did not conduct the tests but that a lab had done so. At that point, defense counsel complained of a discovery violation, claiming he had no idea of a lab’s involvement; and he offered to proffer. After several pages of dialogue outside of the presence of the jury, which was a reargument of the motion to suppress, the witness suddenly advised everyone that the report was negative, not positive.
As far as the trial court was concerned, that revelation rendered the subject moot. This court takes the position that defense counsel did likewise, when, in fact, he had to be as surprised as anyone else. The following excerpt from the transcript begins with a question from the court:
Doctor, did you do it personally or did you have a serologist do that for you?
THE WITNESS: Yes, sir.
THE COURT: Did he make the determination in fact that there was the presence of AIDS complex, or whatever you call it, medically speaking?
THE WITNESS: That’s what I am— well, I am glad you asked that question. I have been waiting. The information is — that I have — the testing was negative.
THE COURT: Did I hear you?
THE WITNESS: Right, I had been waiting for you to ask me that question.
I have a question of my own, Did I mislead you?
THE COURT: Do you have information? We have wasted a half hour.
THE WITNESS: Not necessarily.
THE COURT: Go ahead.
[DEFENSE COUNSEL:] I was told by the prosecutor that you told—
[PROSECUTOR:] The only information that I immediately relayed to the defense — and for all safety reasons— Joan Bennett called me and told me that they had learned that the victim was a carrier of AIDS and they were refusing to do the serology work.
THE WITNESS: I understand what happened here.
[DEFENSE COUNSEL:] Probably the police officer at the scene stated that this man was a homosexual male.
THE WITNESS: That must have been conveyed to Mr. Bennett and it got a little bit out — well it got a better story, but by the item it got to Mr. Bennett — I can’t absolutely be certain that he is negative, but the only testing I could find we did was one set, and he is not in our CBC components of testing.
However, it appears what we have done to date is negative.
THE COURT: Okay. Well, it’s always nice to have to skate out of a ruling here. All right. So then the question is moot at this point.
Motion for mistrial — do you want to withdraw that from your case? You thought that Kern had said somebody else sent the serology test outside to do that.
THE WITNESS: That’s correct.
[DEFENSE COUNSEL:] That’s still the case.
THE COURT: Did you do any blood work?
THE WITNESS: Which?
[DEFENSE COUNSEL:] The blood work.
THE WITNESS: No.
[DEFENSE COUNSEL:] In this case, you got a vial or two or three of the victim’s blood. How many vials would you say?
THE WITNESS: Five.
[DEFENSE COUNSEL:] What did you do with these vials?
THE WITNESS: One — one went to my toxologist [sic] in my office for alcohol and drugs.
[DEFENSE COUNSEL:] Matusiak?
THE WITNESS: Yes.
And one to the police department, ser-ologist.
*972 [DEFENSE COUNSEL:] One went to the Fort Lauderdale Police Department?
THE WITNESS: Yes, actually the Sheriffs Office Crime Lab, via Fort Lauderdale. That’s the way.
[DEFENSE COUNSEL:] The third one?
THE WITNESS: The third one went to the health department in Miami for testing for the presence of an antibody to the virus which causes AIDS and an additional two vials are still stored in my office.
[DEFENSE COUNSEL:] The third one went to Miami HRS?
THE WITNESS: Yes, sir.
[DEFENSE COUNSEL:] What did they test down there?
THE WITNESS: They use the abide lide test EE.
THE COURT: This is like discovery here. This is not the time to do this; okay?
[DEFENSE COUNSEL:] I was told one thing. Five minutes of questioning might be able to resolve this.
THE COURT: The point is, he knows nothing about any AIDS.
THE WITNESS: All the testing we have done, he did not have the virus.
THE COURT: Bring in the jury and let’s finish up with Dr. Wright, then.
[DEFENSE COUNSEL:] Right.
What different tack defense counsel would have taken had he known the test was negative in preparation or in plea discussions is the question. To say that he withdrew his proffer is not accurate; it became moot with the new information.
The trial court closed the door too quickly to determine, adequately, if the violation prejudiced the defense. In State v. Hall, the court found the trial court’s inquiry to be sufficient to conclude that the violation neither surprised nor prejudiced the defense. 509 So.2d at 1097. Here, everyone was surprised; but only the defense suffers. The court in Hall rejected the notion of harmless error in Richardson cases.
In closing, I suggest that the sexual assault by the defendant’s father was just part of the nightmares of his childhood. Like the defendant in Westbrook v. State, 439 So.2d 1039 (Fla. 4th DCA 1983), he appears not to have been disadvantaged as a child, but damned. Someday, hopefully, a more thoughtful society will do what is necessary to prevent children from passing from abuse and dependency to delinquency to adult crime. It will be done, not with mirrors, but by a chief executive with the vision to see the need and a legislature with the courage to commit the necessary funds for parenting programs in public schools and community colleges.
The newly published book, High Risk: Children Without Conscience, (1988) by Dr. Ken Magid and Carole A. McKelvey, vividly describes how infants — deprived of bonding and attachment — have become psychopathic, irremediably, by the time they have reached grammar school age. The authors urge that
certain steps must be taken to assure that the proper attachment bond is formed between parent and child.
Other factors can contribute to faulty infant attachment: high divorce rates, day care problems, lack of a national parental leave policy, epidemic teenage pregnancies, too-late adoptions, the foster care system, absence of mother and/or father during critical periods, post-partum depression, infant medical problems, abuse and neglect and infant unresponsiveness.
Id. at 4. Later the authors write:
Bondless men, women and children constitute one of the largest aberrant populations in the world today. And they contribute far beyond their numbers in social disease and disorder. The cure for such diseases is not simple. But the disease of unattachment can be eradicated by ensuring stable human partnerships for each baby.
“If we take the evidence seriously we must look upon a baby deprived of human partners as a baby in deadly peril,” says Selma Fraiberg (1977). “These are babies being robbed of their humanity.”
As we look at the social problems that are contributing to this national bonding *973 crisis we need to remember that the baby isn’t the only one in deadly peril. We are all at high risk.
Situations such as that which Danny [a Vietnamese psychopath] came from have been studied by researchers who confirm that such babies grow up quite differently from babies raised by loving parents.
A study by Rene Spitz (1965) showed that babies raised in the inhumane conditions of institutions grow up markedly different in behavior from those who become attached to loving mothers or fathers. The unattached babies vocalized very little. They showed none of the babbling, cooing and crying when in need that attached babies do.
Of one 10-month-old unattached baby, an observer said: “The light in Teddy has gone out.”
Id. at 57 (footnotes omitted).